THE STATE OF IOWA, *ex rel.* THE BURLINGTON AND MISSOURI RIVER RAILROAD COMPANY, v. THE COUNTY OF WAPELLO.

1. RAILROAD SUBSCRIPTION BY COUNTIES. The Legislature of the State of Iowa has no power to authorize counties to become, as corporations, stockholders in Railroad Companies; and has never, attempted, by the

The State of Iowa ex rel. v. The County of Wapello.

provisions of § 114 of the Code of 1851, or otherwise, to confer such power; overruling *Dubuque County* v. *The Dubuque and Pacific Railroad Company*, 4 G. Greene, 1; and approving *Stokes* v. *The County of Scott*, 10 Iowa, 166.

2. SAME: STATUTES CONSTRUED. "An act regulating interest on City and County bonds," and "An act regulating the issue of county and corporate bonds," both of which were enacted on the 25th day of January, 1855, regulated the exercise of a power which it was supposed had been already granted; but neither of these can be construed as an original grant of power.

3. RAILROAD CORPORATION. A railroad corporation in this State is a voluntary association, self-organized under a general incorporation act, and is invested with the privileges and franchises which belong to other joint stock companies.

4. BILL OF RIGHTS. The bill of rights, in the Constitution of the State of Iowa, will not be so construed as to exclude, impair or deny any rights not enumerated therein, and retained by the people.

*Appeal from Wapello District Court.*

MONDAY, JUNE 16.

MANDAMUS to compel the issuing of bonds by Wapello County, in payment for stock subscribed in the Burlington and Missouri River Railroad Company.

The facts are stated as the opinion of the court.

*D. Rorer* for the appellant.

The subscription was made under the old Constitution and under the Code of 1851. The county is a corporate body, and the county judge and court are the agent of such corporate body. The acts of the judge and court judicially performed, are not only the acts of an authorized agent of the county, with power to contract, but are *res adjudicata* and binding, when made on a subject matter *prima facie* within the jurisdiction of said court; therefore, a construction of the road making power conferred by the statute, as applying to railroads, is, until reversed,

binding on the county; and especially so when acted on by other parties. Code of 1851, §§ 93, 103, 106, 114–116. For these enactments, there is ample authority in the Constitution. Art. 8, § 2.

The county judge was authorized to cause a vote to be taken as to the appropriation of money to construct roads and to take stock in such roads. The term roads here used, is not limited by restraining language, as county roads, plank roads, railroads, township roads, but is used in the broadest sense, and includes railroads; unless a railroad is not a *road*. A judicial construction has been given to the statute by the agent of the county, and it *is res adjudicata*. *Hopkins* v. *Lee*, 6 Wheat., 109; *Bank of the United States* v. *Beverly*, 1 How., 134.

The continuous and contemporaneous decisions of this court, affirming the power, and the acts of the General Assembly of 1854–5 (see pp. 192 and 219); emanating from the two highest departments of the government, from powers representing the counties as parts of the whole State; under which this contract, and these investments were made, do estop the county, as a person in law, from denying the binding force of the contract. *Dubuque County* v. *Dubuque and Pacific Railroad Company*, 4 G. Greene, 1; *The State of Iowa* v. *Bissell*, Id., 328; *Clapp* v. *Cedar County*, 3 Iowa, 15; *Ring* v. *Johnson County*, 6 Iowa, 265; *McMillan* v. *Boyles*, *County Judge*, Id., 304; *Stack* v. *Maysville and Lexington Railroad Company*, 13 B. Monr., 1; *Cincinnati and Zanesville Railroad Company* v. *County of Clinton*, 10 Ohio, 77; *Justices of Clark County* v. *Turnpike Co.*, 11 B. Monr., 143, 156; *Aspinwall et al.* v. *The Commissioners of Davies County*, 22 How., 365; *The Commissioners of Knox County* v. *Aspinwall et al.*, 21 How., 539; *Graham et al.* v. *Maysville et al.*, 6 Am. Law Reg., 92; *McCoy* v. *Washington County*, 7 Am. Law Reg., 193; *Mygatt* v. *The City of Green Bay*, 8 Am. Law. Reg., 271; *Seeley* v.

*The City of Racine*, 8 Am. Law Reg., 603; *Sharpless* v. *The Mayor of Philadelphia*, 21 Penn. S. R., 147.

The construction of a railroad is as much a matter of public interest, and is as fully within the statute conferring the power to make roads as is the construction of any road. It matters not that the work is performed by a private corporation or person, and with private capital. The road is a great public highway, and the company construct-ing or running it, are the mere agents of the public, for the management and care of the easement, which is in the public. *Beekman* v. *The Saratoga and Schoharie Railroad Company*, 3 Paige Ch., 45; *Louisville, Cincinnati and Charles-town Railroad Company* v. *Chappell*, 1 Rice, 383, 400; 8 Am. Law Reg., 129; *Bonaparte* v. *The Camden and Amboy Railroad Company*. 1 Baldwin C. C. R., 205.

*James Grant*, of counsel in several causes pending in the Supreme Court for parties holding the bonds of counties issued in payment for stock taken in Railroad Companies, submitted an elaborate argument in support of the validity of such bonds, which was considered by the court in the determination of this cause. He reviewed:—

I. The history of the legislation and judicial opinions of the Supreme Court of Iowa on this question; citing Code of 1851, §§ 114, 670. Acts of 1854–5, pp. 192, 219. *Dubuque County* v. *The Dubuque and Pacific Railroad Com-pany*, 4 G. Greene, 1; *The State* v. *Bissell*, Id., 328; *Clapp* v. *Cedar County*, 3 Iowa, 15; *Ring* v. *Johnson County*, 6 Id., 265; *McMillan* v. *Boyles, County Judge*, 6 Id., 304; *Gaines* v. *Robb*, 8 Iowa, 199; *Stokes* v. *Scott County*, 10 Id., 166; *Whittaker* v. *Johnson County*, Id., 161.

II. The question as determined in other judicial tri-bunals, 2 Kent, 310, and the cases there cited, *Raleigh & Gastin Railroad Company* v. *Davis*, 2 Dev. & Batt., 451; Walker's Am. L., 76, *The People, ex rel. Wood*, v. *Draper*, 15 N. Y., 543; *Goddin* v. *Crump*, 8 Leigh, 120; *Harrison*

*Justices* v. *Holland,* 3 Grat., 247; *Bridgport* v. *The Housatonic Railroad Company,* 15 Conn., 475; *Nichols et al.* v. *The Mayor of Nasvhille,* 9 Humph., 252; *Louisville and Nashville Railroad Company* v. *Davison,* 1 Sneed, 637; *Cotton* v. *The Commissioners of Lion,* 6 Fla., 610; *Talbot* v. *Dent,* 9 B. Monr., 526; *Stack* v. *Maysville and Lexington Railroad Company,* 13 B. Monr., 1; *Maddox* v. *Graham & Knox,* 2 Metc., 56; *Shaw* v. *Dennis,* 5 Gilm., 405; *Ryder* v. *Alton & C. R. R.,* 13 Ill., 576; *Lawyer* v. *The City of Alton,* 3 Scam., 130; *Mason* v. *Hart et al.,* 4 Scam., 134; *Prettyman* v. *The Supervisors of Tazewell County,* 19 Ill., 406; *Johnson* v. *Stark County,* 24 Ill., 75; *Thomas* v. *Leland,* 24 Wend., 65; *The People* v. *The Mayor of Brooklyn,* 4 Com., 419; *Grant* v. *Couster,* 24 Barb., 232; *Clark* v. *The City of Rochester,* 24 Barb., 446; *Bank of Rome* v. *The Village of Rome,* 18 N. Y., 32; *Commonwealth, ex rel. Dysart,* v. *McWilliams,* 11 Pa. S. R., 61; *Sharpless* v. *The Mayor of Philadelphia,* 21 Id., 147; *Moore* v. *The City of Reading,* Id., 188; *Commonwealth* v. *The Commissioners of Allegheny,* 32 Id.; *Griffith* v. *Crawford,* 20 Ohio, 609; *Cincinnati, Wilmington and Zanesville Railroad Company* v. *Clinton County,* 1 Ohio State, 77; *Cass* v. *Dillon,* 2 Id., 607; *The State* v. *Van Horn,* 7 Id., 301; 8 Id., 401; *Stien* v. *The Mayor of Mobile,* 24 Ala., 591; *Taylor* v. *Newbern,* 2 Jones' Eq., 141; *Police Force* v. *The Succession of McDonough,* 8 La. An., 341; 11 Id., 649; *Parker* v. *Scogin,* 1 Id., 119; *St. Louis* v. *Alexander,* 23 Mo., 483; *Strickland* v. *The Mississippi Railroad,* 21 Miss., 209; *Aspinwall* v. *Commissioners of Knox County,* 21 Howard, 539; *Zalinske* v. *C. C. & R. R. Co.,* 23 How., 381; *Mygatt* v. *The City of Green Bay,* 8 Am. Law Reg., 28.

III. The moral aspect of the questions; citing *Commonwealth* v. *Commissioners of Allegheny County,* 32 Pa. S. R., 235; *The State* v. *Van Horne,* 7 Ohio, 331; *The State* v.

The State of Iowa ex rel. v. The County of Wapello.

*The Trustees of Union Township*, 8 Ohio S. R., 401; *The State Bank* v. *Hunter*, 1 Dev., 125.

*Knapp & Caldwell* and *J. F. Wilson* for the appellee.

No written or printed argument was found on file.

*Parker & Edwards* being of counsel for some counties resisting the collection of interest coupons attached to railroad bonds, submitted an argument which was considered by the court, reviewing the judicial history of this question as presented by the decisions of the Supreme Court in the cases above cited; and contending that the question has never been finally settled, and that *stare decisis* does not apply. In support of the proposition that such bonds and coupons when void in their inception cannot be rendered valid by a transfer to third parties, they cited WOODWARD, J., in *Stokes* v. *Scott Co.*, 10 Iowa, 166; 2 Par. Cont., 252; 12 East, 304; Edward's Prom. Notes, 337; *Edwards* v. *Docie*, 4 Barn. & Ald., 212; *Smith* v. *Strong*, 2 Hill, 24.

LOWE, J. — On the 24th day of September, 1853, a special election was held in the county of Wapello, agreeably to a notice previously published by order of the County Judge, for taking the votes of the qualified electors in favor of, or against, the proposition for said county to subscribe $100,000 to the capital stock of the Burlington and Missouri River Railroad Company, to be paid in the bonds of said county, redeemable in twenty years, bearing an interest not exceeding 8 per cent, payable annually, to be issued upon the call of said Company, in installments not exceeding 5 per cent per month. Said election resulted in casting 1,067 votes in favor of, and 208 votes against, the subscription. In accordance therewith the County Judge subscribed 1,000 shares of $100 each, and afterwards responded to the first six calls, by issuing and delivering to said company the requisite number of bonds to the

amount of thirty thousand dollars. Due notice of all the other calls covering the residue of said subscription was given, but not observed; and finally the further issuing of bonds in payment of said stock was refused; and thereupon on the 30th day of March, 1859, an information was filed upon the relation of said railroad company, asking for a writ of *mandamus* to compel said county to issue its bonds for the balance of the unpaid stock. This information was dismissed by the court, upon the demurrer of the defendant, alleging, in substance, as the ground thereof, that the said railroad subscription on the part of the county and its agents was not only without the authority of law, but in violation of the Constitution of this State.

The record of the proceeding is now before us, presenting the same question in all its unrelieved force and perplexity, to be decided, we trust, upon principle, rather than upon authority. The supreme tribunals of some fourteen or fifteen States have expressed their opinions upon the exercise of this power by municipal corporations, without reaching, strange to say, conclusions that are satisfactory to the inquiries and consciousness of the public heart. And hence the renewed agitation of the subject, which, doubtlessly, will continue to obtrude itself upon the courts of the country, year after year, until they have finally settled it upon principles of adjudication which are known to be of the class of those that are laid up among the fundamentals of the law, and which especially will leave the capital of private individuals where the railroad era, when it dawned upon the world, found it, namely, under the control and dominion of those who have it, to be employed in whatever field of industry and enterprise they themselves may judge best.

The question, as presented by the records in this case, assumes a duplex form, and is to be considered under two aspects:

First, whether at the time this subscription was made, the Legislature had conferred upon the counties of this State the power of subscribing to the capital stock of railway companies; if so, then, secondly, whether it was competent for the Legislature to pass a valid act giving such power.

The first division of the subject presents no new question in this State, or in this court.

The first adjudication upon the same was in the case of *Dubuque County* v. *The Dubuque & Pacific Railroad Company* (4 G. Greene, 1), where it was held by a majority of the court that the power had been conferred by § 114 of the Code of 1851, was followed in its enunciation by a very clear and able dissenting opinion from Judge KINNEY.

The last decision by our predecessors was in the case of *Stokes et al.* v. *The County of Scott*, (10 Iowa, 166,) where it was held that this power had not been conferred.

The intermediate decisions were an acquiescence in the former of these, by two members of the court, not upon the ground that the Legislature had in fact authorized the exercise of any such power by the cities or counties in this State (for about this they had expressed very great doubts, and affected not to believe it), but because they felt themselves so much committed and trammeled by the previous decision and subsequent legislative recognition, that they did not feel themselves at liberty, from public considerations, to unsettle the construction which the first decision had given to the Code on the subject.

In this aspect of the case it will be perceived that the question now under consideration is an entirely open one in this State, and that this court as now constituted must pass upon it as an original question, wholly unaffected by the doctrine of *stare decisis*; or, if influenced at all by prior decisions, we should be inclined to follow the later rather than the earlier opinions.

The subject of railroad subscriptions by cities and counties in their corporate capacity has elicited a vast amount of legal and speculative discussion, not only in the courts of the country, but outside of the courts, among the legal profession and in our law journals; and it may be remarked, however widely the parties mingling in these criticisms and discussions have differed upon some points, there is one question inseparably connected with the subject, about which there is and has been no disagreement whatever; and that is, that municipal corporations under no circumstances can exercise such a power, in the absence of an express grant from the General Assembly of the State.

This would seem to be a concession *in limine*, that it is, to say the least, an extraodinary power which does not reside inherently in, pertain naturally to, form an incident of, or fall within the scope of, the powers usually exercised by such corporations.

The subscription in this case was taken or attempted to be taken by the county of Wapello in the year 1853. Its authority for doing so, if any it had, is claimed to have been derived from § 114 of the Code of 1851.

WRIGHT, C. J., who prepared the opinion in the above case of *Stokes et al.* v. *The County of Scott*, showed how utterly unfounded was and is this assumption. And upon this particular point in that case the court was a unit. WOODWARD, J., dissenting on other grounds, used the following language with reference to the power being derived from § 114 aforesaid:

" If the power exists, it must have some other foundation. But this is a subject on which change is disastrous. It is one on which we are bound by former decisions. It would not be possible for a judicial opinion to indicate more clearly what would be the view of the court, if it were untrammeled by previous decisions and legislative action, and were free to express its opinions. So far as regards the

existence of the power, true, under the law as it now is, I agree with the Chief Justice, and have so agreed from the time the first case was presented."

In the case just referred to, the then Chief Justice showed that such a construction was not only unauthorized by the spirit and the language of the section in question, but proved affirmatively, from the journals of the General Assembly, that the Legislature absolutely intended, and did expressly withhold from the counties of the State the power to subscribe to works of internal improvement.

He demonstrated it in this way: The Code Commissioners in making their report to the Legislature, presented that part of § 114 that bears upon this point in the following form:

" The County Judge may submit to the people, at any regular election, * * * * the question whether money may be borrowed to aid in the erection of public buildings, whether the county will construct, or aid to construct, any road or bridge which may call for an extraordinary expenditure, *whether the county will subscribe to any work of internal improvement, &c.*"

This last clause, after days of discussion, was stricken out, as an unwise and inexpedient provision. At the next succeeding session of the Legislature a second attempt by the friends of internal improvement, was made to have the power conferred upon the counties, but without success. After these two affirmative acts on the part of the General Assembly to withhold the power, there is no ground left upon which to raise a doubt in regard to the real meaning and object of the above section.

That no improper or extended construction should be given to the word *road*, the Legislature took the precaution, in § 26 of the Code, to define the sense in which it was to be used, limiting its meaning to that of an ordinary " county road," " common road," or " state road." Now

we have an abundance of judicial authority for saying that a railroad is neither of these, for it has been held, both in England and in this country, upon principle as well as upon authority, that the construction of a railway over lands already taken for a public highway, is an additional servitude upon the land, and entitles the owner to additional compensation for right of way ; and that, upon this ground, the use of land for a railroad is vastly more onerous and detrimental to the owner of the fee. 4 Cush., 63 ; 9 Indiana, 433–467 ; 8 Dana, 289.

The great marvel is, that this fragment of legislative history should have escaped the notice of our predecessors who first gave a construction of this section of the Code. Of course, we are not at liberty to suppose for an instant, that with a knowledge of these facts, they could have adopted a construction so utterly at variance with the known and declared intention of the Legislature ; yet that it is so, there remains not the shade of a doubt.

We inquire, then, whether the want of authority on the part of the county of Wapello to make this subscription, has been cured or legalized in any way by subsequent legislation. On the 25th of January, 1855, the Legislature passed two acts, one to the effect that city and county railroad bonds should not draw a greater interest than ten per cent, but that they might be sold by the company at such discount as may be deemed expedient. The other limiting the time within which said bonds should be issued, and requiring the proceeds thereof to be expended within the county issuing them. It cannot be said that either of these acts confer the power in question, nor do they, upon their face, purport to legalize the power where it has been exercised in the absence of any such grant. He would be a bold jurist who could affirm that they were anything more than a *regulation* of a grant or power already supposed to be existing.

Upon what ground, then, can the county of Wapello be compelled to issue and deliver to the company these bonds in payment of its subscription? Great stress is justly placed upon the fact that, after all, § 114 of the Code, under the authority of which a majority of the people of Wapello county voted to subscribe the stock, is open to construction, and inasmuch as the highest tribunal of the State has construed it to confer the power, and by reason of which construction a large number of bonds have already issued and passed into the hands of innocent holders, therefore a change of construction would now be an unjustifiable interference with vested rights. It must be remembered, however, that we are considering this question at a point of time when the force of this objection has suffered much abatement, from the fact that the responsibility of this change has already been incurred by our predecessors, so far as it affects two members of this court, and that we are not at liberty wholly to thrust aside the obligation laid upon us of considering the last as well as the first of these judicial constructions. Hence with us it becomes in the main a question of the first impression. Nevertheless, the writer of this opinion is not insensible of the great strength of this position, and he is free to admit that if the question before us involved no other principle than that of a right construction of a statutory enactment, he could not be persuaded to disturb adjudications under which large interests have been acquired. But, unfortunately, in his opinion, this case does raise a question of much graver import, which goes back of the statute, and which must find its solution in the personal conscience and judgment of each court, in view of its connection with, and bearing upon, the great fundamental and reserved rights of the citizen.

This brings us to another and much more important branch of this subject, which has chiefly for its consideration, the question whether the Legislature can, under any

circumstances, pass a valid law which will make it lawful for a county or city in its corporate capacity to subscribe stock in a railroad company.

The consideration of this proposition naturally refers itself to the true theory of our State government, the nature of municipal, and the character and responsibilities of railroad corporations. If we can ascertain the relations between these several corporate bodies, and the inherent elements of power on which each is founded, we may be able to deduce the principle that ought to govern in determining the question in controversy.

We commence the examination of this subject, first, with what we understand to be some of the leading features or characteristics of a railroad corporation, under the laws of this State, together with the rights, obligations and responsibilities of those who become stockholders in such corporations, in order to exhibit the bearing and judicial effect of a county railroad subscription upon the rights of individuals, for the lawfulness of such subscription must depend much upon the question whether the reserved rights of the citizen are or are not injuriously affected thereby.

1. A railroad corporation in this State, is not created by a special charter granted directly from the legislature, but is a voluntary association, self-organized, under a general incorporation act, which confers upon them the ordinary privileges and franchises that belong to other private joint stock companies.

The general act just referred to, the object as well as the mode of accomplishing that object, the law that regulates their conduct, establishes their rights, and fixes their duties and liabilities, show very conclusively that these corporations or extended partnerships, are essentially private and not public; that they are associated capital in aid of private industry and enterprise, directed, to be sure, in this instance, to works of internal improvement, but only as a

means to an end, which end is the making of pecuniary profit in the business of common carriers.

Then, again, the authorities showing such companies to be private corporations are numerous, many of which will be found collected in a note by Redfield on Railways, page 5.

2. They are contracts between the State and the companies which cannot be affected by subsequent legislative interference; no power of modification, change or repair having been retained in the law authorizing their formation: 2 Kent, 272, marginal. Subject to this qualification, they are, nevertheless, under the control for certain purposes, and to a limited extent, of the General Assembly of the State.

3. They are voluntary, — the condition of membership being the payment of a certain amount of stock freely and without violence offered to the will. It will not be, as it has not been contended by any one, that the corporation itself, or any other power in the government, can resort to any compulsory process to compel an individual citizen to become a member of such associations. Like all other contracts, to become a party thereto must be a matter of absolute personal choice.

4. The officers of these corporations are elected, and business matters which turn upon a vote, are all determined upon a principle totally different from the elective franchise as it exists under the laws of the State. Each member is entitled to a vote for every share of stock he may own, making thereby the amount of capital invested by each member, instead of the number of individual votes, the basis of representation in regulating and controlling all its business operations and interests.

5. The final cause or object of these moneyed associations is to engage in and carry on the business of common carriers. That they are such, see Redfield on Railways, 234:

It is said to be an elementary principle of law that all who carry goods or persons for all who apply, are common carriers ; and as this is the thing which railway corporations hold themselves out to the public to do, it follows that they stand before the world in this attitude, charged with all the hazards and extraordinary responsibilities which attach themselves to this relation, subject to the same laws which control the action and fix the liabilities of all other classes of common carriers.

It is proper, in this connection, that we should allude to the nature and extent of some of these risks and liabilities.

They are insurers for the safe and speedy transportation of goods, freight and baggage. This covers every description of loss and damage, not occasioned by the elements, and the enemies of the country. They are responsible for the greatest care for the safe transit of their passengers, and answerable for the smallest negligence by which death or personal injuries ensue, or other detriment to third persons and domestic animals. These risks are the more imminent for the reason that these companies are necessarily compelled to employ a large number of servants and agents, for whose laches on the one hand, and promptness and fidelity on the other, they are responsible.

These characteristic outlines of a railway stand in marked contrast with those of municipal corporations. The latter are public, not private, political not trading and speculative, corporations. They have no contract functions to be impaired, or faith to pledge. They exist simply at the will of the legislature, subject to be altered, extended, or blotted out of existence. They are sometimes styled quasi-corporations, because they do not possess all the incidents that belong to corporations that have been organized for commercial, manufacturing, trading, and the various details of internal improvement.

In other words, they are invested with corporate attributes *sub modo*, that is, for special ends and local necessities. They may be said to occupy the place of intermediate agencies or instruments of government, standing between the people and the sovereignty of the State, for the purpose of devising and executing certain local police regulations which it would be inconvenient, if not, indeed, impracticable in some instances, to do directly by the legislature. Their powers are all derived, and being purely civil and political, they cannot overstep the boundary that limits their true municipal province.

Almost from the necessity of the case, municipal corporations must move in their appropriate, and prescribed orbits, outside of which they have no privileges, nor can they legitimately exercise any power or superintendence—unless in a few exceptional cases, touching guarantied regulations, the supply of water to cities, &c. These objects, promoting alone the comfort and health of those within, are strictly municipal, although the money to be expended, and the means to be employed in securing them, may be external to the chartered limits of the city.

The condition of membership in these corporations is not that of the payment of a given sum of money, but simply a residence therein, under the implied obligation, however, that such resident will yield a submission in obedience to their police regulations, and share their just proportions of the burdens imposed in the execution of their various trusts. These burdens come in the form of taxes, to levy which is, to be sure, an attribute of sovereignty, but, under the peculiar plan or economy of our State government, is shared in, to a limited extent, by counties and cities, and even school districts. To these several quasi-corporations are confided distinct trusts; they move therefore in spheres separate and distinct from each other. If a School district should levy and attempt to collect a tax

foreign to the objects of the common school system, the act by common consent would be pronounced invalid. If a city should tax its inhabitants to build a court house for the benefit of the whole county, or to defray the expenses of the district court, the act would encounter at once the resistance of such inhabitants as unjust and unequal.

It will also be conceded that counties in exercising the taxing power must be restricted to purposes alone municipal and local. The citizens of a particular county cannot be taxed separately for an object in which the public at large is generally interested, nor, on the other hand, should the whole State be taxed for an object partial, and limited in its benefits to a single county. Chancellor KENT in his Commentaries, vol. 2, 331, expresses the true doctrine on this subject when he remarks: "Every person is entitled to be protected in the enjoyment of his property, not only from invasion of it by individuals, but from all unequal and undue assessments on the part of the government. * * * * The citizens are entitled to require that the Legislature itself shall cause all public taxation to be fair and equal in proportion to the value of the property, so that no one class of individuals, and no species of property, may be unequally or unduly assessed."

All this the people of this country very well understand, and have readily acquiesced in the taxing power without complaint, as it has generally been exercised. Nor has there been much conflict of opinion respecting what are, and what are not, legitimate objects of municipal regulation and superintendence, until cities and counties began to involve their citizens in heavy liabilities by subscribing in their corporate capacities, stock in railway companies. This, from the beginning, has been regarded by many as an alarming innovation upon the rightful province of these corporations, and, as a consequence, has been the fruitful source of much legal controversy. It is admitted that, as

the counties have been heretofore constituted, as instruments of government they could not lawfully make such subscriptions without an additional special grant of power from the Legislature to enable them to do so. This, at the threshold, proves the power to be preternatural. In our judgment it is more,—it is wholly unjustifiable, and is not, and cannot be, derived from the revenue power of the county, at all. Why? Because county revenue must be paid into the county treasury. There is no other depository where it can lawfully go, or be placed. When there, it must be under the control and disbursements of the county agents. No other authorized agencies or officers have a right to touch it. Then, again, it must be applied, through the regularly constituted agents, to public and not to private objects,—that is to say, to matters pertaining to the internal policy of the county, in which all its citizens have a common interest.

Now what is the case with a railroad subscription? As a matter of form it is called a tax, and as a matter of convenience it is collected by the same process as county revenue. But is it treated as county revenue after it is collected? Does it go into the county treasury? Is it collected and paid out by county agents, for county purposes? The fact is, the county has nothing to do with it after its collection; it is applied in payment of the railroad subscription, goes into the treasury of a private railroad company, is alone controlled and paid out by its officers for purposes pertaining to their own private schemes of trade and speculation. To call it, under such circumstances, a county tax, is simply a solecism in language. The true test to determine the character of a particular fund is the use to which it is to be applied and not the name that may be given to it, as a pretext for raising the same under the cover or pretense of a tax.

If, then, a county railway subscription cannot be legitimately based upon and paid out of the county revenue, the power to make the subscription must fall to the ground —for, if the right exists at all, it must be deduced from the taxing power, not only as it is exercised in the mode of its collection, but in its custody, management, and application to the local necessities of the county. We are not unadvised of the answer which the Kentucky, Ohio and some other courts have usually made to this view of the subject. At the proper place we will state the substance of that answer, and the reason why it fails to be satisfactory to us.

As yet we have only developed, in part, the principle involved in the subject of this controversy.

Having already stated the most striking characteristics of railway and municipal corporations, in order that we might be able more clearly to bring out in appreciable relief the practical bearing which county subscriptions have upon the reserved rights of protesting citizens, we will endeavor to complete the picture, by running out a little more in detail, some of the consequences flowing from such a relation.

It must be remembered that when counties subscribe stock in a railway company they take upon themselves the duties and responsibilities common to all other stockholders; that they subject themselves, not only to the law that governs private corporations, but the by-laws and regulations that may be adopted from time to time for the government of the company, and to that extent it presents the anomaly of a public corporation, possessing some of the attributes of a government, subordinating itself to the behests of a private joint stock company formed for the purposes of trade and pecuniary profit.

Not only so, but the county embarks itself with all its citizens, in the hazardous business of common carriers, with

all its stern and extraordinary liabilities; so that the two hundred unwilling citizens of Wapello county who pro tested against changing their business relations, will not only be compelled to pay their proportional part of the capital stock to launch the enterprise, but must necessarily incur the risk and the expense of carrying on the undertaking as long as they reside and hold property in the county, or the Company continue *in esse*. We have already alluded to the nature and stringency of the duties and responsibilities of common carriers. The liability of the citizens of Wapello county, for losses, failures, accidents, damages, resulting from the negligence of railway servants, is not limited to their own county, for these things, but wherever they may occur along the whole line, from the Mississippi to the Missouri river.

Still more, if the railway company, of which the county of Wapello becomes a stockholder, should form a running connection with other distinct lines, stretching across the continent to the Atlantic coast, and should sell tickets, and check baggage for, or over, the route, which is now usually done, it has been held that an action will lie against either company for loss of baggage and detriment to passengers. 4 Seld., 37; Redfield on Railways.

If a loss occurs anywhere upon this continuous line, the citizen of Wapello county may be made liable for his fair proportion of the same. These losses are frequent, and sometimes exceedingly heavy.

If the Burlington and Missouri R. R. Co. should be sued and held liable, the county of Wapello, like individual stockholders, is bound, under certain contingencies, by the laws of this State, to pay her proportional share of such losses out of her separate property. See § 689 of the Code of 1851. This section, to be sure, is now modified by the Session Laws of 1858, chapter 119, so as to limit the individual liability to the amount of stock held by such member.

Subject to this section, as thus modified, it is competent for the company, it is true, to exempt the private property of its members from liability for corporate debts. In the case before us, the plaintiffs have done this in adopting their articles of incorporation. But it was equally their right to have organized their Company upon the individual liability basis, and it is made their duty, under § 678 of the Code, in publishing a notice of their organization, to state whether private property is to be exempt from the corporate debts. It is believed by some that this they may do yet, if they choose, by altering the articles of incorporation, and fixing the individual liability of their members within any pre-scribed limit or maximum.

Whether they shall ever exercise this right, is immaterial to this argument. The fact that they have the power to do so, and may exercise it, and the further fact that under the provisions of § 689, above referred to, they may be held individually liable under the contingency therein specified is sufficient to exhibit the principle we are trying to develop. We will suppose, then, that the contingency in question does happen, and a large judgment is obtained against the Burlington and Missouri R. R. Co. for some of the thousand losses and accidents for which, as common carriers, they are liable. This judgment should be satisfied out of the corporate property of the company. But all know that this property, as a matter of necessity, and not generally from any fault of the company, is ordinarily covered with mortgages, given to raise money for the construction of the road, and cannot be reached by execution. The conse-quence is, that each stockholder, in the case supposed, is liable to an amount equal to the stock he has invested. Where a county, in its corporate capacity, has taken stock in a railroad, we suppose it will have to pay its proportion of this judgment, in the same manner that the original subscription was paid, by a tax levied upon the property

of each citizen, in proportion to the assessed value thereof. If any citizen of the county, having property, refuses to pay the contribution assessed upon his property, he may be coerced to do so by a forced sale of the same.

Now, when he pays this money, who gets it? Does the county? Is it applied to any local or municipal purpose in which the people of the county have a common interest? By no means. It is not even applied to any purpose connected with the construction, repair, or maintenance of the railway, the building of which was made the pretext or foundation of the original subscription. It goes into the pockets of a private individual, for an injury or loss which he had sustained as passenger, or as a consignor of goods, on a railway operated by the company as a common carrier. In other words, the payment of the money is due alone to the fact that the party paying it is engaged in the business of a common carrier, and has incurred a liability incident to that business, which the law requires should be liquidated. Such a liability is the necessary and legal consequence of the relation which he holds to the business community as a common carrier. If his property can be taken to pay losses of this description, that proves beyond doubt the existence of such a relation.

I have shown by the laws of this state, that, under certain circumstances, the individual property of the citizen of Wapello county, can be taken to pay the debts of this company, growing out of their responsibilities as carriers.

Now, how did the two hundred citizens of Wapello, who voted against the railroad subscription, come to hold this business relation with the public? By their own choice? The result of their own untrammeled will? We have seen that it was not. The only answer that can be given to this question, is, that it was in consequence of an act of the Legislature, conferring the power on the county of Wapello

to subscribe, in her municipal capacity, stock in a railroad company. Nothing can be clearer to the mind of the writer of this opinion than that the exercise of this power and freedom in the choice of pursuits cannot stand together. If such a law can be upheld as a rightful exercise of legislative power, then the reserved rights of the citizen, as well as the guaranties of the Constitution, are all a myth.

That the Legislature could pass a law which would compel each property holder in the county to take one or more shares in a railroad company, none will pretend. Why? Because such a law would strike not only at the principle of property, but would be a wholly unjustifiable constraint over the minds of men in the choice of their business pursuits. Yet between such a law, and the one we are discussing, there is no difference in their practical effect. For, under either law they are alike made parties to a contract against their will, embarked in a business not of their own choosing, required to pay, perhaps, about the same amount of money as capital stock, and subject to the same liabilities as carriers.

If there is any difference, the law we are considering is the more objectionable of the two; for the citizen who is implicated as a quasi-member in the operations of a private joint stock company, through some mystical relation which he sustains to the county as a body politic, he has no personal control or voice in the management of the business of the company, whilst his responsibility for mismanagement is or may be personal. Not only so, but should he grow weary of the enterprise, and would fain dissolve his connection therewith, he cannot sell out as could an individual stockholder, nor buy himself off, nor give away his interest in the concern in order to avoid further responsibility. His only alternative to effect such an object, is to abdicate his home, sell his property, and remove from the county.

Now, we desire to ask upon what principle this legislative interference with the business pursuits of men can be justified. We are told that county and city railroad subscriptions have been upheld as valid by the courts of all the States where the question of their validity has been raised. Granting this to be true, yet these decisions have been made in many instances by divided courts, and they have failed to compose the doubts of multitudes of professional and unprofessional men, who affect to believe that they are at war with natural justice.

Again, we do not feel at liberty to adopt these adjudications unchallenged, for the reason that they have all been made with special reference to the statutory and constitutional law of their respective localities. This prudence we feel bound to imitate, for it is possible they may be right, and still the exercise of the power under the laws and Constitution of this State, be wholly unauthorized. Nevertheless, we wish to look a little into the foundation of this power as it has been presented by a number of the courts, as well as some of the more prominent grounds upon which its exercise is predicated and justified.

First. It is claimed that the General Assembly of a State possesses all legislative authority not delegated to the General Government, or prohibited by its own Constitution; that the bill of rights, as enumerated in the Constitution, must be referred to as the basis of judicial decision; that it is not in the power of the court to enlarge this list of rights; that such extension would involve an alteration of the instrument; that if the court can add to the reserved rights of the people, they can also take them away; that outside of the rights enumerated in the Constitution lies a vast field of power not reserved, prohibited, or given away, over which the Legislature has full and uncontrolled sway; that their use of this power is only confined by their discretion, and not the subject of judicial animadversion.

This argument is based upon the idea that inasmuch as the Constitution withdraws from legislative interference, a certain specified list of rights, without any allusion to, or recognition of other reserved rights, that therefore these others, if any there may be, are not within the protection of the courts, but must be redressed, if abused, by arguments addressed to the Legislature itself, and not to the courts.

The soundness of this interpretation of a Constitution framed in the manner suggested in the argument, need not be denied or affirmed by us, for the reason that we must view this question of legislative power from the stand-point of our own State Constitution.

The Constitution of Iowa seems to have been written upon entirely a different theory, and utters quite another language, the words of which must furnish the only criterion by which we are to determine the rightful exercise of a given power. The first article of our Constitution contains an enumeration of certain fundamental rights; but it also contains a positive negation of the presumption that this specified list excludes the existence of others, for the last section of this article declares that "*this enumeration of rights shall not be construed to impair or deny others, retained by the people.*"

The object of this saving clause, we suppose, was to guard not only against the above construction given to bills of right, not containing any such reservation, but to bring these unenumerated rights retained by the people, founded equally, it may be, upon natural justice and common reason, as those that are specified within the censorship of courts of justice, when even they shall be assailed. What other tribunal in the government can be invoked to checkmate, such an abuse of unauthorized power? Our bill of rights allows the taking of private property for public use, upon making compensation therefor, but does not prohibit in terms the taking of private property

for private use. If this should be done by an act of the Legislature against the protestations of the owner, would it not be as flagrant an abuse of legislative authority, as would the taking of private property for public use without compensation?

The latter, it is true, is expressly excepted from the general power of the Legislature, but ought not the former to find equal security and protection, recognized as it is, under the saving clause in the bill of rights referred to? And we ask, who is authorized to say that the judges of some of the States, where this power has been upheld, and especially Judge BLACK, in his very able and learned opinion in the case of *Sharpless* v. *The Mayor of Philadelphia*, 12 Penn. S. R., 147, would have adopted the line of argument above indicated, if the Constitution of these States, and that of Pennsylvania had contained a similar saving clause in the bill of rights, to that in the Constitution of this State? To say the least of it, we think it questionable.

*Second.* Besides the doctrine that the Constitution allows the Legislature the use of every power which it does not positively prohibit, a theory which we have attempted to show is inconsistent with the acknowledged rights reserved and secured under our plan of government. The right to tax the property holders of public corporations to aid private joint stock companies in building railways, is referred to considerations like these—that railroads are calculated to develope the resources of the State, and promote the happiness and prosperity, the social and commercial intercourse of her citizens; that, therefore, the State is charged with the duty of encouraging and building, or aiding in building, these great thoroughfares, that in accomplishing this, she may employ means adapted to the end: Do it directly herself, through the power of taxation, and the employment of such extrinsic agencies as may be necessary to

carry forward the undertaking; or she may do it indirectly through the instrumentality of counties, cities or even private corporations; that if she adopts this latter course, it involves no other principle than the choice of means, which she has a right to make. Again, that if the State could do the whole work herself, she can do a part; and that this includes the right to select the method of effecting the same. That if she could aid private corporations to build railroads, the use of which is public, by the right of eminent domain, so she could by the power of taxation; and this latter power, she may lawfully transfer to her subdivisions to be used by them for the same end. That the right of eminent domain and taxation attach as an incident to the power of government, that inasmuch as the former may be rightfully exercised in granting the right of way to private corporations in constructing railways; it carries with it the right to employ the latter power in aid of such enterprises, that if the Legislature can create a debt, and lay taxes on the whole people for a work of general interest, it may with equal propriety allow the people of a particular county to tax themselves to promote, in a similar manner, a public work in which they have special interest; that the matter of authorizing counties to take stock in railway companies may be, it is true, an unwise and independent policy, liable to very great abuse, still it does not fall within any of the prohibitory clauses of the Constitution, and therefore, it must like all other improvident legislation, find its corrective in the action of the General Assembly, and not in the doctrine of the courts.

The foregoing really is the substance of the argument as we have been able to collate and condense the same from the different adjudications made use of to sustain the validity of an act of the Legislature, empowering municipal corporations to become stockholders in railway companies.

That the reasons on which the argument is founded are exceedingly plausible none can very well deny; that they are not, however, exhaustive of the argument, as applicable to the laws and Constitution of the State, we must insist. The question is not whether the State may not lawfully construct and maintain by herself, or through her subdivisions, a system of public roads, including railways nor whether she may not, in accomplishing this legitimate object, levy a tax upon her citizens; nor whether she may not even aid private corporations as a choice of means, to an end in effecting the same object. All this may be conceded, nevertheless this obligation of the State, in this aspect of the question, is made the chief predicate of the above argument, as we understand it, whereas, it is only the incident which seems to have been illogically exalted above the principal question in controversy. The complaint is not that the object is unlawful, or unconstitutional, but that the method of obtaining the object is. The rights of a citizen may be as injuriously affected by the unlawful character of the means employed to accomplish a given object, lawful in itself, as by the commission of an unlawful act. To illustrate: the Legislature has the power to alter and change the law of the remedy, but, in exercising this power, it must adopt a constitutional mode, and it cannot do it in a manner (as has frequently been attempted,) to impair the obligation of contracts, otherwise the law, to that extent, would be a nullity. So, to tax a citizen, to keep up a system of highways in his county, of which he has the free use, in common with all the other citizens of the county, the payment of which involves him in no contract obligations, and is followed with no future liabilities, or personal annoyances, is one thing; while the levy of coercive contributions, ostensibly for a similar purpose, but in such manner as not to give him or the public an unrestrained use of the way, in the construction of which

money was expended, yet which, nevertheless, has the inevitable effect to change his business relations, fix upon him the obligations of contract, as well as the responsibility of a carrier, altogether a different thing. We have already demonstrated the practical effect which a municipal railroad subscription has upon the individual rights of citizens of such municipalities in the State. If we are correct in our statement of this effect, and the conclusions drawn therefrom, we cannot but think they constitute a decisive answer to the argument upon which we are commenting. That argument, in the condensed form in which we present it, seems, it is true, to overlook this aspect of the case, and it is possible that the same consequences do not flow from a county becoming a stockholder in a private railway company, as it respects the rights and liabilities of the citizen taxpayer in those States, as it does in this State. Although some of the courts have intimated the possibility of such being the result, and deprecated the exercise of this power as dangerous and extraordinary.

Believing that we have exhibited a principle underlying this power which practically overturns one of the reserved and fundamental rights of the citizen, that of making his own contracts, choosing his own business pursuits, and managing his property and means in his own way, and which, under the Constitution of this State, however it may be elsewhere, entitles him to the intervention and protection of the courts, we are willing to risk the consequences resulting from the exercise of such a power, as furnishing a sufficient answer in itself to all the reasons which have been, or may be, assigned in favor of its exercise.

If any will take the trouble, especially of those who believe the law possesses the dignity of a science, and holds an exalted rank in the empire of reason, to analyze this question with reference to the principles and the theory of our own political organization, he will discover that it

does implicate a right which, in importance, is above all or any interest connected with the business relation or the physical improvements of the county.

There are various other objections to the exercise of this power in this connection and in this particular case, which it might be interesting to discuss, but we forbear except as to one, to which we make very brief allusion. It relates to the necessary inequalities of burdens thrown upon the citizens of Wapello county, in the event they are required to pay the subscription of $100,000. When paid it is expended in building a railway from the City of Burlington on the Mississippi river to some point on the Missouri river, stretching across the entire State. Neither the work therefore, nor the benefits thereof, are confined to the county of Wapello, but is of general interest as well as special, and therefore comes within the sphere and duty of the State to see (if the work is to be constructed by a tax), that the burden is borne equally by the whole people. For if the county of Wapello is made to pay so large a sum on a work not of local, but confessedly of state importance, whilst an adjoining county, equally interested and benefited, is required to pay nothing, the inequality would be both flagrant and oppressive, and should not be suffered.

The doctrine in consonance with the theory of our political system is, local governments for local objects, and state government for objects of general interest. These principles were very clearly expounded by Mr. Binney, of Philadelphia, in an opinion given by him upon the right of that city to subscribe for stock in the Pennsylvania Railroad Company. Speaking of the city, he says:

"When we come to the consideration of matters which are not part of her local duties, and are not within her local superintendence, but operate *indirectly* upon her welfare, as everything done by the state, anywhere in the state, does, more or less—roads, bridges, canals, public works of any

kind — there, as they are a matter of public concern, and *operate upon others, as well as on the city,* are altogether within the duty of other persons, and no power can be implied in the corporation to affect them, or any part of them. The state may tax our property to make such works; the city cannot. The power to carry on such public works by the resources of her inhabitants, or the power to make them because they might afterwards, by a local work, be made available in the city, cannot be maintained, without *throwing the state out of her orbit, and putting the city in her place.*"

Although satisfied to have the questions presented on the law of the case as herein above stated, still we are unwilling to conclude this opinion without a brief allusion to one or two other constitutional objections to the validity of any act which the Legislature might pass, authorizing counties to subscribe stock in railway companies.

Section 2, Article 8, ordains that "The state shall not, directly or indirectly, become a stockholder in any corporation."

Section 1, Article 7, ordains, that "The General Assembly shall not *in any manner* create a debt or debts * * * which shall singly or in the aggregate * * * exceed the sum of one hundred thousand dollars," &c.

The object of the first of the above prohibitory clauses we suppose was to keep the province and functions of the state as a police power separate and distinct from the business operations of the country. It would seem that the same reasons of prudence and policy would apply with equal force to her subdivisions. But we have referred to this clause of the Constitution that we might inquire how it is that counties obtain the power to subscribe stock in railroad companies. They have no inherent power of their own— they have no power derived directly from the Constitution. It was competent, perhaps, for the framers of the Constitution to have given to counties certain powers which they

might have withheld from the state, but this they did not do. It is claimed that this right in a county to take railroad stock is a police power. We do not admit it ourselves, but the whole argument in favor of exercising it is founded upon this idea. Now the county, it is conceded, cannot exercise this power independently of the Legislature, but this power is also reserved by the Constitution from the Legislature. Whence then comes this power? How does it arise? Will it be said that the Legislature can confer a police power which she herself does not possess? We do not believe that such is the theory or nature of the legislative department of our state government. We know that she may confer powers upon the judicial and executive departments, and authorize them to do acts which she herself could not do, for the reason that these are distinct and co-ordinate branches of the government, the functions of which cannot be performed by the General Assembly, but which, nevertheless, are, to a certain extent, under legislative control and regulation. When we say, therefore, the Legislature cannot bestow upon her subdivisions, rights, and powers reserved by the Constitution from her, we mean of course a police power. These subdivisions received their corporate existence and all their corporate duties and powers from the Legislature. They are intended as instruments of government in the hands of the Legislature, to aid it in the administration of its public regulations within certain prescribed localities. This being the case it is competent for the Legislature at any time to suspend these agencies and reclaim the powers which she had thus conferred, and execute them directly herself. If, then, there should be any power which she could not thus reclaim and exercise herself, it follows that it was conferred without authority. Let us put this proposition in the form of a syllogism:

All police powers which the State may legitimately confer upon her subdivisions, may be reclaimed and exercised

by herself, but she cannot reclaim and exercise the right of a stockholder in a railroad company; therefore she cannot confer the exercise of this right as a police power upon said subdivision.

The absurdity of conferring upon counties the authority to take stock in railway companies is further apparent in this. If such authority is exercised, and the Legislature should afterwards find it expedient to suspend or repeal the corporate existence of such county, as they have already done several times in this State by annexing its territory to adjoining counties, then what becomes of this railroad subscription? and what becomes of the interest which the people of the county have in this stock? and what becomes of the rights of the bondholders, whose claims against the county do not mature for twenty years? Let the advocates of this power answer these questions.

If it should be said that such an act of the Legislature would be invalid because it would impair the obligations of contracts, then it would follow that the Legislature by conferring this authority has lost its control over the boundaries of counties.

Now, as to the other prohibitory clause, in regard to the limitation of legislative authority to create an indebtedness. And upon this subject I speak for myself, and not for my associates. The object of this prohibition was not to secure the people of this State from the evils and burdens of an indebtedness created for the ordinary expenses either of State or county organizations, for such expenses have never been the source of serious complaint or oppression.

It is not, therefore in this sense that the indebtedness referred to in the above clause of the Constitution has any application either to county or State debts. Its real object was to secure the people of this State against a species of vicious and improvident legislation, known to have been indulged in by other States, whereby a large indebtedness

had been contracted for an extravagant system of internal improvements, and, as a consequence, heavy burdens in the form of taxes imposed upon the people.

But it is said that there is a plain distinction between county and State indebtedness, and that this clause of the Constitution was intended to be only a limitation upon the indebtedness of the latter. It is questionable whether the language of the Constitution will admit of so narrow a construction. It reads as follows : " *The General Assembly shall not* IN ANY MANNER *create a debt or debts*     *    *    *    * *which shall singly or in the aggregate exceed the sum of one hundred thousand dollars.*" It will be observed that the restriction, in terms, is not against the creation of a debt on behalf of the State, any more than on behalf of her subdivisions. We see no reason for confining this inhibition to a State indebtedness by name in contradistinction to that of counties or other municipal organizations. The language is broad enough to cover any manner of indebtedness above $100,000 the creation of which shall be authorized by the General Assembly, and the burdens of which are to be borne by the people.

Counties have no power of their own to contract large indebtedness for works of internal improvement. If they do so, under the authority of a legislative act, would not this be the creation of a debt in *some manner* that would violate the letter as well as the spirit of this prohibitory clause of the Constitution, and to carry which would result in taxation as burdensome to the people as if the same debt for the same purpose had been contracted in the name of the State?

But suppose this clause of the Constitution could be construed to apply only to such legislative acts as authorize a debt on behalf of the State as a whole, would it not in that event also embrace in principle every legislative act which authorizes a debt to be contracted by any of her

territorial subdivisions of which the State is composed. The object was not to protect the State from the embarrassments of a heavy indebtedness, merely in her abstract meaning as a body politic, entirely disconnected from her people and her soil, but in her concrete sense as composed of her property-holders and citizens, and their local communities of towns, cities and counties. The burden is precisely the same to the people whether imposed by a debt contracted in the name of the State of which they are citizens, or imposed by a debt contracted in the name of counties of which they are members. And it must be confessed that the above provision of the Constitution would wholly fail of its purpose, unless it could be construed to apply to the power of authorizing a debt on behalf of municipal corporations, as well as on behalf of the State. A construction which renders a provision of a statute or of the Constitution void and nugatory, is never admissible if it is susceptible of a different interpretation that will effectuate its real object.

Strong and plausible as are these and other reasons which might be given in favor of construing this clause of the Constitution as denying the Legislature the right to authorize or permit counties to contract large indebtedness for works of internal improvements, still as it is not necessary to do so, I am not just prepared to say that such an act, if passed by the General Assembly, would be in contravention of this prohibitory clause of the Constitution. Doubts are entertained of this fact by very good lawyers, and this reminds me of the well recognized rule that courts should never set aside and annul an act of the Legislature, unless it was clearly and beyond a reasonable doubt in conflict with the Constitution. At the same time I must be allowed to express my want of respect for that subtle and refined argumentation, and far-fetched implication, by which the plain meaning and intention of that sacred in-

strument are attempted, too often, to be defied and superseded.

For the various reasons which we have herein stated, we have to say that we are deliberately of the opinion that the General Assembly of this State cannot pass a valid law authorizing counties in their corporate capacities, to become stockholders in railroad companies—that as a matter of fact no such act has ever yet been passed by the Legislature of this State—that with or without such legislative authority counties have no corporate power to take such subscription —that the election held as aforesaid in Wapello county for the purpose of taking a vote whether the county should not subscribe one hundred thousand dollars as stock in the Burlington and Missouri Railroad Company was nugatory and void—that the Company cannot in law compel the county aforesaid to issue her bonds in pursuance of said vote—and finally that the judgment below dismissing plaintiff's writ of mandamus should be affirmed.

In enunciating this decision, we desire to say that we have followed our convictions of right, of duty, and of law, which seem to take no denial. We could not bring ourselves to consent to surrender a great fundamental right, which had cost long ages of conflict to extort from the governing classes in favor of the governed, and which not to vindicate, lying, as it did, at the very foundation of this controversy, would have been a step backward towards despotism.

Nevertheless, we are not insensible that in doing so, at this late day, we are liable to expose ourselves and our people to the charge of insincerity and bad faith, and perhaps that which is still worse, inflict a great wrong upon innocent creditors and bondholders — consequences which we would most gladly have avoided, if we could have done so, and been true to the obligations of conscience and principle. Yet it is one of those unfortunate misadventures

which sometimes will happen in the best governed and best intentioned communities.

We know, however, that there is such a thing as a moral sense and a public faith which may be successfully appealed to, when the law is impotent to afford relief. These sentiments, we cannot but believe, still reside in the hearts and consciences of our people, and may be invoked to save themselves and their state from seeming bad faith.

Affirmed.