*23
 
 Beck, J.
 

 (dissenting)
 

 This court has ruled in at least eight cases that the people cannot be taxed to raise money - for the payment of county and city railroad bonds. This is the effect of, the course of decisions upon the questions growing out of the county and city railroad bond cases. It is not pretended, in the opinion of the majority of this court just announced, that there is any distinction in principle between those cases and this. But to avoid the effect of this conceded and indisputable fact, it is said that the decisions in those cases were not based upon the want of constitutional power in the legislature to authorize the levy of such a tax, but upon the alleged omission of the legislature to bestow upon the cities and counties the power so to do. Here is a most grave error of fact. This court
 
 has
 
 decided, that, under the constitution, the power in question is not possessed hy the legislature, and cannot be conferred upon the counties and cities of the State. A brief reference to the adjudged cases will vindicate the positive assertion I make.
 

 I will notice in the first place
 
 The State ex rel.
 
 v.
 
 The County of
 
 Wapello, 13 Iowa, 389, the leading case upon the questions involved in the railroad bonds litigation. Upon pages 393, 394, Lowe, J., gives a statement of the facts of the case, which are simple and few, being the vote of the people to subscribe stock to the railroad company, to be paid in bonds of the county; the subscription of the county judge, for the county, to the capital stock of the incorporation; the issuing and delivery to the company of a part of the bonds provided for by the vote; the demand of the residue by the company, and the refusal by the county officers to issue them. Thereupon an information, upon the relation of the company, was filed, asking for a writ of mandamus to compel the county to issue bonds in payment of the balance of the stock subscribed. The opinion then proceeds, in the statement of the case, in the following words: “This informar
 
 *24
 
 tion was dismissed by tbe court, upon demurrer of tbe defendant, alleging, in substance, as the grounds thereof, .that the said railroad subscription on the part of the county and its agents was not only without authority of law,
 
 but
 
 m
 
 violation of the constitution of the State.”
 
 It thus appears that the very ground of objection made by the defendant was that’ the subscription, and, of course, all proceedings to carry it out, were in violation of the constitution of the State.
 

 On pages 394, 395, Justice Lowe, in stating the questions presented for determination, uses this language:
 

 “ The question, as presented by the record in this case, assumes a duplex form, and is to be considered under two aspects. First, whether, at the time this subscription was made, the legislature had conferred upon the counties of the State the power of subscribing to the capital stock of railway companies; if so, then, secondly, whether it was competent for the legislature to pass a valid act giving such power.”
 

 Five pages of the opinion are devoted to the inquiry whether the power had been conferred upon the counties, and the conclusion arrived at that the legislature had made no attempt so to do. The constitutional question is examined in
 
 tmenty-f/oe
 
 pages, and the power, either in the legislature or in the counties, is utterly denied upon constitutional grounds. This question Was presented by the pleadings; it was the main question in the case; the first question was the subordinate one. It is claimed that as the determination of the first question authorized the final conclusion arrived at, the affirmance of the judgment of the court below, all that is said upon the constitutional question is mere
 
 diefrnn.
 
 But the question
 
 is
 
 in the case, and it
 
 is
 
 determined. The fact that it is second in the order of consideration cannot make the determination thereon
 
 dietum.
 
 Its deteimination, by adopting the view of my brothers, rendered the decision of the other question unnee
 
 *25
 
 essary, and with equal fairness all that is said upon the want of legislative grant of power to the county may be claimed to be
 
 dictum.
 
 I am astonished that such views should be entertained and expressed by my learned brothers. The simple statement I have made of the facts of the case, and the grounds of the decision, will disclose the grave and mischievous error into which they have fallen.
 

 The State
 
 v.
 
 The County of Wapello
 
 is followed and approved in
 
 Myers
 
 v.
 
 The County of Johnson,
 
 14 Iowa, 47. The statement of the case is brief as well as the opinion. The county was sued upon coupons of bonds issued to a railroad company; defense, fraud in issuing the bonds, and the absence of power and authority in the county to issue them for the purpose intended. A replication, pleading a former adjudication, was held bad upon demurrer The ruling upon the demurrer is sustained, and the decision in a sentence re-affirms the rule in
 
 The State
 
 v.
 
 The County of
 
 Wapello, as to the want of power in the counties to issue such bonds.
 

 The next case decided by this court is
 
 McMillan et al.
 
 v.
 
 Boyles et
 
 al., 14 Iowa, 107. From the statement in the opinion it appears that plaintiffs insisted that the bonds were void, because “they are not only unauthorized by the laws and the constitution of the State, but in contravention of both.” A demurrer to the petition was sustained. Following
 
 The State
 
 v.
 
 Wapello Co.,
 
 and upon the principles therein announced, the judgment of the court below was reversed.
 

 Rock et al.
 
 v.
 
 Wallace,
 
 14 Iowa, 593, follows next in order. The opinion is brief, and holds the county bonds in question invalid on the authority of
 
 The State
 
 v.
 
 The County of Wapello.
 

 Smith
 
 v.
 
 Henry County,
 
 15 Iowa, 385, was an action upon coupons of certain county bonds issued to a railroad, in payment of a county subscription. A demurrer to the petition was sustained. Upon appeal to this court, it
 
 *26
 
 appears from the opinion that the questions involved in
 
 The State
 
 v.
 
 The County of Wapello
 
 were re-argued, counsel conceding that decision to be against the power of the county to issue the bonds. The arguments, adverse to the ruling of the court in that case, are declared to have been most ably and carefully prepared. But the court adhered to the prior decision in the cases above referred to, in the following language :
 

 “The want of.power under our
 
 constitution
 
 and laws is so clear, and the argument, against the right to exercise it is so well sustained and conclusive, as we have attempted to show in the eases above cited (the same above quoted), that we cannot longer regard it as- with us open for controversy. In this State it must be considered settled.”
 

 Ten Eyck
 
 v.
 
 The Mayor of Keokuk,
 
 15 Iowa, 486, without a statement of the facts of the case further than to show that the same questions were presented to the court that- had been determined in the prior cases, follows their rulings.
 

 Chamberlain
 
 v.
 
 The City of Burlington,
 
 19 Iowa, 395, was an action-to restrain the city authorities from.levying and collecting taxes for the purpose of paying the interest upon certain bonds issued by the city upon its subscription to the capital stock of a railroad. The statement of the case,- as contained in the report, is lengthy, and shows that the bonds are claimed, in plaintiff’s petition, to be void, because of want, of authority of the city under its ordinances and the laws of the State to issue them, and because they were issued for an illegal 'purpose. A demurrer to the petition was overruled by the district court, and, upon the-questions presented by the decision, the case was submitted to the court. The ruling of the district court was affirmed, Cole, J., delivering the opinion. The questions discussed relate to the power of the city under its charter and. the laws of- the State to levy and collect taxes for the-payment of the bonds issued by the city. This,, of
 
 *27
 
 course, involved their legality. It may be admitted that the constitutional question was not passed upon in the opinion. But the case is valuable for my present purpose, as it clearly shows that the court, as then constituted, and especially the learned justice delivering the opinion, who now concurs with the majority in this case, regarded the constitutional question as presented in and determined by the cases I have above noticed. The opinion uses this language: “ The following cases determined by this court hold that counties have no
 
 eonsütwtíonal
 
 or legislative authority to bind themselves by the issuance of bonds for railroad stock.” The cases cited are those above referred to.
 

 McClure
 
 v. Owen, 26 Iowa, 144, is the last case determined by this court in which the question as to the constitutional power of counties to collect taxes for the payment of railroad bonds was directly presented for our decision. It was a proceeding to enforce the collection of taxes levied for that purpose. The relief was asked upon the grounds of irregularity in the actions of the officers issuing the bonds, and the want of power in the counties to issue such obligations. A few quotations from the opinion wiil most clearly show the points decided, the authority relied iipon, and the views of the court, as then constituted, upon the constitutional question. My learned brother, the present chief justice, concurred. Upon page 248 will be found the following language:
 

 “We are asked by appellant’s counsel to change the later ruling of this court, and abandon the principles of the adjudications so frequently heretofore announced in the cases that have arisen upon these county and city railroad bonds. This we are asked to do, not because the rulings and the principles of the construction of our constitution upon which they are based are unsound, but because the supreme corut of the United States, which is termed, in the language of appellant’s counsel, the final
 
 *28
 
 arbiter of these questions, has disregarded the decisions of this court, and, in cases before it, has overruled them.”
 

 The question decided in
 
 The State
 
 v.
 
 The County of Wapello
 
 is stated in the following language:
 

 “ It is held by a unanimous court, in a carefully prepared and well-considered opinion, after elaborate and profound argument by counsel among the ablest in the State, that the constitution confers nb power upon the legislature to authorize counties and cities to become stockholders in railroad corporations, and to borrow money upon their bonds for the purpose of payment upon such stock, and that under the constitution they are forbidden so to do.”
 

 The cases above noticed are cited as following and reaffirming
 
 The State
 
 v.
 
 The County of Wapello.
 
 The opinion’ then announces that “the principles of these adjudications, independent of their authority, have the unqualified approval of this court as now constituted. We see no reason to depart from these rulings.”
 

 In
 
 Hanson
 
 v.
 
 Vernon,
 
 27 Iowa, 28, the constitutional question was again before this court, and prior adjudications were again examined and re-affirmed. Dillon, C. J., in his able opinion, uses the following language:
 
 “
 
 If any thing can be said to be settled in this State, it is, that under the constitution there is no legislative power to endow public or municipal corporations with the faculty of subscribing to the stock of railroad companies, and to levy'a tax on the inhabitants to pay therefor. Every body so understands it. I have so understood it ever since I have been on the bench, and have never felt myself at liberty to regard it as an open question.
 
 Not one of the oov/nsel concerned in this case has eroer asTced the cou/rt to overturn that decision, cmd to hold such subscription and tax to be constiirwtionalP
 
 The learned chief justice, still further on in his opinion, affirms that it was decided in
 
 The State
 
 v.
 
 The County of Wapello, “
 
 that the legislature could not, under any circumstances, pass an act which
 
 *29
 
 will make it lawful for a county or city in its corporate capacity to subscribe stock in a railroad company.” Tbe opinion of Wright, J., in the same case, more carefully notices tbe course of adjudication of this court, and tbe points ruled in tbe several cases, and arrives át tbe same conclusion. These opinions expressed tbe view of tbe majority of tbe court. Cole, J., dissenting.
 

 In order, if possible, to determine if in fact any reasons exist for tbe position of my-brothers, that tbe constitutional question was not in tbe cases above cited, and that, therefore, all tbe decisions therein are mere
 
 dicta,
 
 I have examined tbe record of so many thereof as tbe clerk has been able to find in bis office. Tbe records in
 
 Smith
 
 v.
 
 Henry County
 
 and in
 
 Rock
 
 v.
 
 Wallace
 
 I have not seen. In my opinion tbe question is fairly presented in all those I have examined. All of tbe records contain objections to tbe bonds, against tbe payment of which relief is claimed, founded upon their invalidity and want of binding force. In my opinion no one of tbe records withdraws tbe constitutional question from tbe consideration of tbe court, but, on tbe contrary, tbe court was required, in view of tbe want of constitutional authority in the legislature, as presented in tbe records, to clothe counties and cities with tbe power to issue bonds, to bold them invalid upon that ground.
 

 In
 
 McMillan
 
 v.
 
 Boyle,
 
 tbe petition of plaintiff, upon which tbe relief was granted, presents tbe constitutional question and no other. An injunction is asked to restrain tbe collection of taxes to pay tbe bonds and to declare them void upon 1jhe ground, and no other, that they were unauthorized by and in conflict with tbe constitution of tbe State. In
 
 Ten Eycke
 
 v.
 
 The City of Keokuk
 
 tbe petition of plaintiff asks that the defendant and its officers be enjoined and restrained from tbe collection of taxes leviedj or to be levied, for tbe payment of tbe interest and prin
 
 *30
 
 cipal of the bonds of tbe city issued upon its subscription to a certain railroad company. It is expressly admitted in the petition, tbat, by an act of tbe legislature, an attempt was made to confer tbe power to issue the bonds upon tbe city, and that another legislative act was passed with tbe express purpose of “curing, establishing and making legal and binding ” tbe bonds in question. See Acts of 5th General Assembly, (1856) pp. 118, 119. These enactments are expressly referred to. Tbe only objection made to tbe bonds are those of a constitutional character, and it is not pretended tbat tbe bonds are invalid for want of power conferred by legislative enactment. Tbe simple point made is, tbat they are unauthorized by, and in conflict with, tbe constitution. I repeat, tbat in all tbe cases tbat I have cited, except
 
 Chamberlain
 
 v.
 
 The City of Burlington,
 
 so far as I am able to discover upon examination of tbe records thereof (with tbe exception above mentioned), and tbe reported decisions therein, tbe constitutional question is fairly and expressly presented; and tbat question and no other is presented in tbe two last mentioned.
 

 Probably no litigation tbat has arisen in tbe State has been conducted with more ability and vigilance than that growing out of county and city railroad bonds. This is especially true of this litigation in the United States courts. No cases have been more critically examined than those of this court, declaring void paper of this kind.
 
 The State
 
 v.
 
 The County of Wapello
 
 has been subjected to tbe closest scrutiny by many able counsel. It was overruled and disregarded by the United States supreme court in
 
 Gelpcke
 
 v.
 
 Dubuque,
 
 1 Wallace, 176. Tbe counsel in tbat case, supporting tbe validity of these bonds, as it appears from their argument, printed with tbe report of tbe court’s decision, do not question tbe fact tbat tbe constitutional question is properly presented and decided in
 
 The State
 
 v.
 
 The County of Wapello.
 
 There is no claim by them tbat the decision therein is
 
 dictum.
 
 I have
 
 *31
 
 never heard, that any attorney for the bondholders has, in any case, claimed the like. The United States supreme court, in
 
 Gelpcke
 
 v.
 
 Dubuque,
 
 and in all other cases where the question has been before it, concedes that this court, in
 
 The State
 
 v.
 
 The County of Wapello,
 
 and other cases, has decided against the constitutionality of the bonds in litigation. Ve can find nowhere in all of this protracted litigation, from courts or counsel, the intimation of an opinion that.these decisions are
 
 ddcta.
 

 The foregoing -'examination of adjudged ’ cases in this court justifies the statement I have made, that this court has repeatedly denied the constitutional - power of the legislature to authorize taxation to aid in the construction of railroads owned .by private corporations. I have shown that all the judges making the decisions so understand it; the courts in the land so understand it; the bar so understand it; the people so understand it; and, until the dissenting opinion in
 
 Hanson
 
 v.
 
 Vernon,
 
 a doubt upon the subject was never expressed. A striking instance of the unanimity with which all minds admitted the fact may be mentioned. The question incidentally arose in a case in argument before us on the day the opinion of the majority' was announced. The counsel, among the ablest at' the bar, conducting the argument on both sides, admitted the fact that the decisions of this court upon the question were as I have above stated. I may well express my astonishment that my learned brothers should have fallen into so serious an error. It may probably be explained by the fact that the case was not argued before us, and the opinion was prepared without the .aid of the discussion of counsel, which all courts so highly prize, especially when great questions are presented for consideration, and authorities are relied upon. The appellant’s counsel, though among the ablest at the bar, favored us with neither printed, written or oral argument, and the brief discussion on the part of the appellee was, as I remember, confined exclu
 
 *32
 
 sively to the impolicy of declaring the law unconstitutional, in view of the great advantages of railroads to the business of the State, and the development of its resources, and the great want under which the people labor for facilities of transportation. The necessary haste in the preparation of the opinion, resulting from the accumulation of the business of the court, may have had something to do in the failure of my brothers to perceive the points decided in the cases heretofore in this court, involving the constitutionality of taxation for the purpose of building railroads.
 

 The opinion of the majority of this court overrules
 
 Hanson
 
 v.
 
 Vernon, supra,
 
 which held an act of the legislature of 1868, in no essential particular affecting its validity different from the one in question, unconstitutional and void. Both these acts make it lawful for townships, incorporated towns or cities to aid in the construction of railroads, by levying a tax not to exceed five per centum upon the assessed value of the property thereof, to be paid to the corporation building the road. Nothing in the way of stock, nor any interest in the road, is to be received in return for the money so paid the corporation, but it is to be a free gift on the part of the townships or towns voting the tax. The acts provide for the method of calling into exercise the power conferred, and the manner of collecting the tax, and the payment of the money to the corporation. Their provisions are not essentially different, and as it cannot be pretended that these matters in the least affect the question of power on the part of the legislature to authorize the taxation, it is needless to notice them. In two provisions the acts differ. The act of 1870 provides that the money may be raised by taxation “to aid in the construction of any projected railroad in this State.” The act of 1868 provides for the taxation in aid of any railway located in, or which may be contiguous to, the township voting the tax. The act of 1870 provides that all rail
 
 *33
 
 roads constructed in this State which shall accept the township aid, “ shall be subject to the control of the general assembly in regard to the management of the same and the charges for the transportation of freight and passengers thereon.” The prior act contains no such provision. In my opinion, there is no such difference in these acts as would render one unconstitutional and void and the other valid. As to the question of power in the legislature, to authorize taxation as provided for by either, it is the same in both cases. If there be any difference, the first is the less objectionable. It provides for taxation to build roads in the township or town, or those contiguous thereto; the second authorizes taxation for any road wherever it may be located, within the State. Under it a tax may be levied in the city of Keokuk, to build a road in Alamakee county.
 

 The later act provides that the roads built with the aid of the tax shall be subject to the control of the State as to their management and rates of transportation. The. first act contains no such provision. Will my brothers maintain that the legislature has not such power over all railways ? Are they prepared to hold that this provision at all increases the legislative authority over railway corporations ? These are grave questions, and I am glad that in this case they have not been touched.
 

 The majority in their opinion do not pretend that the acts are essentially different upon points which affect the constitutionality of either. In my opinion they are each equally invalid. All that is said in the majority opinion in regard to their difference is, that there are important modifications in the last upon the provisions of the first. The subject is dropped with that single remark. It cannot be claimed, therefore, that the law is sustained because these modifications cured it of any invalidity by reason of constitutional objections.
 

 The law of 1868, as I have before remarked, was declared unconstitutional in
 
 Hanson
 
 v.
 
 Vernon.
 
 In the
 
 *34
 
 outset of the opinion of the majority, this fact is stated, and is the introduction of the following observation:
 

 “ If this case but involved a second time the validity or the act of 1868, annulled by this court in the case referred to, we might regard the question as to
 
 that
 
 act settled by that case, but as the general assembly has re-asserted its authority, and re-enacted the law with important- modifications, we have treated the question as still an open one, and have given it as full and careful examination and consideration as we are capable of.”
 

 Here we have stated the reason for overruling
 
 Hanson
 
 v.
 
 Vernon.
 
 As we have seen, the difference in the provisions of the respective acts has no weight with the majority in the conclusion. The ground, as given in the above extract for regarding the question involved as open, is, that the legislature “
 
 re-asserted its authority cmd re-enacted the la/wV
 
 I have never heard it claimed that the legislature, by the re-enactment of an unconstitutional law, could make it valid, or that such action on the part of that branch of the government,
 
 the re-assertion of its authority,
 
 should influence courts in the determination of constitutional questions, and require them to regard as open questions of that character, which are settled by a long course of adjudications. It is a virtual surrender of the most important power and most sacred character of the courts — the power to annul all unconstitutional laws —the character that places them above every influence, public and private. Legislative action or opinions cannot be made, with safety to our form of government, a test of the constitutionality of laws, nor should they influence courts to disturb well-settled precedents and rules of constitutional construction.
 

 The right of this court to declare void, for unconstitutionality, a law of the legislature is conceded by the majority, and the rule is stated in language of no greater force than is usually employed for that purpose. I understand that the power must not be exercised except in clear
 
 *35
 
 cases, where there cannot be a reasonable doubt, in the judicial mind, of the unconstitutionality of the law in question. Now, as we have seen, the law under consideration in no essential respect differs from the act of 1868, which was declared unconstitutional; and this court has settled, by a long course of decisions, that the people cannot be taxed to aid in building railroads, even when the counties and cities in which the tax is levied receive, in return, stock in the companies. How can it be said that upon this subject there can be a doubt in the judicial mind, when it is not an open question, but determined by a course of decisions that in all courts ought to preclude debate thereon, and forever put it at rest. If we who occupy this bench do not regard the decisions of this court, who will, and where will be the end ? Will not those who succeed us disregard our determinations as we do those of our predecessors ? If the judicial mind cannot rest upon judicial determinations of all questions, how may they be settled ? There can be no greater reproach to the administration of justice by the courts than the well-founded charge of oscillating decisions. This court, we know too well, has suffered in that way on account of the conflicting decisions upon the validity of county and city railroad bonds, though the later decisions had the almost unanimous approval of the legal mind of the State, and are most emphatically applauded and concurred in by the majority opinion, though disputing the reasoning upon which they are based.
 
 St<we decisis
 
 is a maxim the application of which is necessary, not only to secure private rights, but to preserve and maintain the authority and confidence due to courts of last resort. In contemplation of law, we occupy this bench as a court, not as individual judges. It ought not to be understood that the law will or does change with the opinion of the judges who, for a time, sit here. When the law is solemnly declared by this court, there it ought to rest, and it ought not to be understood that, when new
 
 *36
 
 judges come upon the bench, the people may expect a change in well-established rules and principles that protect their rights. In this way only will the certain and equal administration of justice to all be secured.
 

 The construction given in the majority opinion to section 25 of the bill of rights, in my opinion, totally destroys its force and effect. The section is in these words : “ The enumeration of rights shall not be construed to impair others retained by the people.” The enumeration of rights contained in article 1 of the constitution, denomi nated by the instrument itself the bill of rights, includes both political, and those which are usually termed private, rights. As I understand the argument of my brothers, it is this: By another section of the bill of rights, it is declared that all political power — political power includes legislative power — is in the people. The people have conferred upon the g-eneral assembly
 
 all
 
 legislative power inherent in them, except what is expressly reserved in the constitution. It follows that the power of the general assembly is supreme, except as it is limited by express provision of the bill of rights. This is the sum of the argument. But my brothers forget that the bill of rights secures private as well as political rights, and that section 25 plainly implies that the people retain others beside those enumerated. Now it is very clear that the legislature cannot encroach upon any rights retained by the people, and, as to them, is not supreme. Iii this view the words of Wright, J., in
 
 Morrison
 
 v.
 
 Springer,
 
 15 Iowa, 342, quoted for that purpose, fall very far short of supporting the conclusion reached by the majority, as above stated. The very section of the bill of rights above quoted withdraws from the power of the legislature the reserved rights of the people. These no free government can interfere with or destroy. Among these rights is the personal right of every citizen to be exempted from all exactions of money by the State, disguised under the name
 
 *37
 
 of taxation, for purposes not public in tbeir character.
 
 In a word, dll rights cure reserved by the people, the surrender of which is not necessary to the full cured'perfect working of ou/r free government.
 

 This view is in accord with the construction of the constitutional provision under consideration, as announced in
 
 The State
 
 v.
 
 the County of Wapello,
 
 13 Iowa, 412. I know of no decision of this court wherein a contrary doctrine is advanced, save the one to which I am now expressing my dissent. A few thoughts will make plain the principle just announced. The constitution is not the origin or foundation of the people’s rights ; it confers none that they did not possess before its formation. When they formed the instrument they were possessed of all rights with which nature endows all men. Society organized upon the basis of Christianity and a high state of civilization, the institutions pertaining thereto, and the inalienable rights of man, were in existence and recognized as the inheritance of the people. For the protection and preservation of these the
 
 people
 
 established this free government. Its frame-work is the constitution. It is obvious that, by the constitution, the people surrendered no rights they possessed before it was formed that an enlightened and Ohristain people ought, or may, enjoy under a free government. Whatever rights of the people are demanded by a government designed to protect the rights of life, liberty, property and the pursuit of happiness, existing before the constitution, the people surrendered in that instrument, and no other. Those not surrendered are the reserved rights'of the people referred to in section 25 of the bill of rights. Over these no power in the State is supreme.
 

 The power conferred upon the general 'assembly by the people in the constitution is a power to legislate upon all rightful subjects of legislation in a manner that shall not interfere with their reserved lights: If it be not so,
 
 *38
 
 then have the people failed of their purpose in the formation of the constitution, which cannot be admitted.
 

 To the extent necessary to maintain the government, it may be admitted that all the property of the citizen may be taken in the exercise of the taxing power. But the exercise of this power is limited by this inflexible rule: it must be for the purposes of the government — for public purposes. v Taxation for any other purpose is utterly unauthorized, is a usurpation of power, and an act of oppression. I know of no express provision in the constitution limiting the exercise of the taxing power as above stated, yet no one will deny that it can only be exercised within such bounds. It is, therefore, in my opinion, not true, as stated in the opinion of the majority, that the legislative power “ is bounded only by the limitations
 
 written
 
 in the constitution.”
 

 It will not be pretended that the legislature can confer power which it does not itself possess. Will it be claimed that the general assembly may by law levy a tax upon certain townships for the purpose of bestowing the money raised thereby as a gratuity upon a railroad corporation ? Would this court sustain such a law? In principle there is no distinction between an act of that character and the one under consideration. Both laws have the same object, the same effect. The act in question is a grant of power to a majority of the voters of a township to do what, it must be confessed, the general assembly has rio power to do. It must be that all restrictions upon the direct exercise of power are applicable in its indirect exercise. Therefore, all the “limitations written in the constitution” against taxation of the character in question, when directly levied by an act of the legislature, if there be any, forbid the exercise of the power when it is attempted to be conferred upon the majority of the voters of a township.
 

 The maxim of the common law, that the power of parliament is supreme, is not applicable to our government.
 
 *39
 
 The rights of Englishmen are declared in and preserved by their constitution. Our rights existed before our constitution. Their constitution is a grant of rights by the government to the people; ours is a grant of power by the people to the government. The English government is supreme, the people subordinate. Here the people are supreme and the government but a creation of their will, an instrument for their protection. The view of my brothers is applicable to the English constitution, and not to the constitution of Iowa.
 

 The long list of decisions of courts of other States cited in the opinion of the other members of the court are considered of little weight upon the questions involved in this case, when it is remembered that the constitutions of the respective States wherein they are rendered are dissimilar to ours. The constitutional provisions upon which the decision in
 
 The State
 
 v.
 
 The County of Wapello
 
 is based, it is believed, are not to be found in the fundamental laws of those States. I have not the time to pursue an investigation of the subject that will enable me to speak positively upon this point. Yet, when it is remembered that many of those cases were decided by divided courts, often by a bare majority of the judges, which is the fact in regard to some of the leading cases, it is a matter of no little amazement that my brothers should follow them against the repeated decisions of this court, unanimously rendered, and which, as I have shown, have heretofore been regarded by the legal mind of the State as finally settling the question.
 

 To the question whether the construction of railroads is such a public purpose as will authorize taxation therefor, I will devote no time. To me it appears utterly unreasonable to hold the construction of a railroad a public purpose, when every thing pertaining to it, save the public easement devoted to its use, is property of a private corporation, intended for private gain. I will not notice this
 
 *40
 
 point further here, for I cannot do so without repeating what I said in my concurring opinion in
 
 Hanson
 
 v.
 
 Vernon.
 
 Upon that opinion, as well as the opinion of the chief justice in the same case, I am satisfied to rest my conclusions upon this point. I can add no force to them.
 

 I cannot concede the force of the argument of the majority, as expressed in their opinion, based upon the doctrine that the right of way of railroads is acquired under the exercise of the right of eminent domain. It is this: Under that right, power is granted by the legislature to private corporations building railroads, to condemn and appropriate the use of lands over which it may be necessary to construct these roads; the right of eminent domain can only be exercised for public purposes; therefore the construction of railroads is a public purpose. The application of this conclusion is as follows: As railroads are thus shown to be public objects, and as taxes may be levied for all public purposes, they may be for the construction of railroads, even though the people in their corporate or political capacity receive, in return for the taxes paid by them, no property in the roads, which are, as to their ownership and profits — I do not speak of their control — private property. The error in this argument results from leaving out of view the character of railroads and the corporations building them.
 

 I will proceed to inquire into the character of railroads and the corporations constructing and owning them, and of the right acquired in lands, over which they pass. The conclusions reached will enable me to determine upon what principles lands are condemned in the exercise of the right of eminent domain for the purposes of railroads. The result, I believe, will demonstrate the fallacy of the argument above stated.
 

 It will not be disputed that the rails, ties, bridges, cars, station-houses and all other equipments of railroads are
 
 *41
 
 private property; their use and employment is under the control of private persons,
 
 i. e.,
 
 private corporations. I do not, of course, speak of the railroads built and owned by the State, or any corporate or political subdivision of the State, if there be such; neither must I be understood to deny the legal right of the State to regulate and control railroads owned by private corporations in a proper manner, and to a certain extent. But those roads and all property pertaining to them are designed for the public convenience and patronage. Mills, hotels and stage coaches are maintained for the same purposes. Unless the public wants require them they will not be built. The public patronage is necessary to support them. But the -public has no ownership in this kind of property. It simply has an interest in and right to its use, and cannot be excluded therefrom upon compliance with proper rules as to compensation, etc., adopted for its control. It may be described, in one sentence, as private property devoted to public use for the purpose of private gain.
 

 Railroads in this State are usually, if not always, owned by aggregate corporations. These corporations are strictly private, and in them the public — the State — has no right of property. It is unnecessary to discuss any views as to what extent, if any, the State may regulate and control these private corporations. No one will deny that they are private and exist for private pecuniary profit. The State is entitled to no part of their earnings. I will not be understood as intimating that they are exempt from taxation. A railroad corporation is no more public than a corporation whose object is the erection and management of a hotel, or the building and operating of a line of steamboats. The objects of these corporations are all alike, namely: to realize profits for their stockholders, by transporting the people and then- goods.
 

 It. will be seen that these views, which cannot be questioned, verify the accuracy of the description above given
 
 *42
 
 of railroads, namely: they are private property, devoted to public use, for the purpose of private profit.
 

 Our next inquiry is this: What interest do railroad corporations acquire in lands over which their roads pass? Upon this point there is no dispute; all authorities unite in holding that they acquire no other interest, unless by purchase, than a right of way — an easement; the title remains in the land-owner ; the use of so mu'ch of the land as may be necessary is given for the purposes of the road. Upon what principles is the use of the {land taken for this purpose ? This is an important question, and, in my opinion, the key that will disclose the error in the opinion of the majority. The character of the corporations building railroads, and the exclusively private character of their property, forbid a thought that any thing exists in either, apart from their business objects, that will authorize the State, for them, to exercise the right of eminent domain, or to clothe the corporations with the power to exercise that right. Let us suppose the case of a railroad built by a private corporation, and not intended to transport the public and the goods of the public, but exclusively confined to the object of transporting the property of one person, or of the corporation owning it. Such may be the case with a railroad built from a coal mine. Will it be pretended that the right of eminent domain may be exercised to condemn lands over which it may pass ? Most assuredly no claim of the kind can be made. See
 
 Bankhead
 
 v. Brown, 25 Iowa, 540.
 

 The corporation and road in this case will differ in no respect from the corporation and road built for public patronage. We may thus clearly see that the right' of eminent domain is not exercised on account of the corporation, or road built by it, but because the object of the corporation and road is for the use and convenience of the public. It is not exercised on account of any character possessed by the road or corporation aside from public use and convenience. When exercised, the use of the road must be
 
 *43
 
 public. For whom is the right exercised
 
 %
 
 The answer is plain,— for the public.
 

 The right of locomotion must be free; the people must be allowed to travel and transport their goods wheresoever they will. They must not be confined to any particular means of transportation, but must'be permitted to adopt those which they esteem best adapted to their comfort, convenience and interest. One cannot selfishly forbid the use of his lands for the public travel; he holds them subject to the right that the State may exercise, which we call the right of eminent domain, to open lines of travel over them, on payment of just compensation. But, as we have seen, the right will only be exercised for the public. If the convenience, interest or comfort of the people require a particular means of locomotion, it cannot be denied them. It has been found that railroads are better adapted to public convenience than other means of public travel, and that the better way of building them is by private corporations, rather- than by the State or by the political subdivisions of the State. The relation of the public and the railroad corporations is thus easily understood. The right of way, the easement of the road, is acquired for the public; the corporation is private, and the road is its private property. The exercise of the right of eminent domain gives to the people, not to an individual, the right of way — the easement — over lands. The corporation, in consideration of compensation to be paid by the public using the road, undertake the construction and operation of the road, which, as we have seen, is private property. We have then the case of a private corporation, whose object is private profit, but whose
 
 business
 
 is the public accommodation, occupying an easement which can only be taken under the right of eminent domain by the people. There is no mystery in this: the easement is in the public; the means oí transportation is private property. This results from the necessity of the case, or from public policy. It is found
 
 *44
 
 that the public interest is best subserved when the structure and equipments of a railroad are owned by private corporations. The corporation is permitted to occupy the right of way — the easement — which can be alone taken for the public, on condition that it will supply means of public transportation. It cannot be said that the corporation thereby becomes public, or the road it owns becomes public property, or a public object or purpose, in its construction and maintenance. The easement of a common highway is in the public. A stage-coach maintained for public ponvenience 'and public patronage, whereby private gain is acquired, is priyate property; yet it cannot be operated without using the easement granted to the public. No one will argue that it is therefore a public object, for the maintenance of which the people may be taxed. It is in no sense different from the property of railroad corporations. The fact that the railroad corporation exclusively uses the easement in the business of transportation does not change nor weaken the argument. The necessities of the case require the occupation to be exclusive. Neither does the fact that great expenditures are necessary to be made, to prepare the lands over which the easement extends for the proper use of a railway, affect the argument. To fit a common road for the profitable use of stages or express wagons may require great outlays by the owners of such property. I well remember an instance where, for miles, a common road was improved at great expense by stage-owners, to enable them to prosecute with greater profit their business of transporting the public from one town to another. Can it be claimed that the people could have been taxed to make such improvements, which were needed only by private persons, to render their business more remunerative ?
 

 The fact that the State authorizes railroad corporations to institute proceedings to condemn lands under the right of eminent domain, and requires them to make com
 
 *45
 
 pensation to the land owners, does not support - an argument against the view I take that the easment is acquired for the public and not for the corporation. In the case of a public road, one or more citizens may institute proceedings for the appropriation of lands to the public for a highway, and, nnder our statute, in certain cases, the parties who so institute the proceedings may be required to pay to the owner the assessed value of the lands. The easement, however, is taken and held by the public.
 

 At the risk of repetition I will state again my conclusion on this question. The easement which is used by railroads pertains to and is acquired by. and for the people. It is public in its nature, for it is used by the people, the corporation supplying the means for its use. These means, the railroad and its equipments, are private property, devoted to private gains. The people cannot be taxed for the purpose of raising money to be given to private persons or corporations to enable them to acquire such property.
 

 The argument I have just noticed, upon which so much stress is laid, in the opinion of the majority, is, in my judgment, most conclusively answered in a line of reasoning differing from the one which I have presented, by Dillon, C. J., in
 
 Hanson
 
 v.
 
 Vernon,
 
 21 Iowa, 28 ; by Dixon, C. J., of Wisconsin, in
 
 Whitney
 
 v.
 
 Sheboygan Railway
 
 Company, Am. Law Reg., March, 1870 ; and by Coolet, J., of Michigan, in
 
 The People
 
 v.
 
 Township
 
 Board, Am. Law Reg., August, 1810. I forbear to present the arguments of these decisions, which I fully approve, being content to rest my conclusions upon the views I have expressed above.
 

 The decisions in the cases just referred to discuss fully and most ably the whole ground covered by this case. The views therein expressed in
 
 regard to
 
 the constitutional limits of the legislative power I most fully approve. They completely answer the arguments and conclusions con-
 
 *46
 
 tamed in the opinion of my brothers, and the inferences to be drawn therefrom, and render any further effort on my part in that direction quite unnecessary.
 

 In my opinion the decision of the majority of this court in this case will fail to settle the important question involved. It is in the face of eight prior decisions of this court. It overrules
 
 Hanson
 
 v.
 
 Vernon,
 
 which holds unconstitutional a law, as I have shown, in no respect different from the one in question. It is contrary to the recent most able and satisfactory decisions of the supreme courts of Michigan and Wisconsin upon the same question. The most eminent writers upon the law cordially approve those decisions; they will condemn the one made by the majority of this court in this case. It cannot and will not satisfy the legal mind of the country that it is of greater authority than the adjudications it overrules. It is contrary to the spirit and experience of the times. Pennsylvania, Illinois, and probably other States, where the courts have sustained, as do my brothers, taxation of the people to aid in the construction of railroads, after having endured the oppressions and evils flowing therefrom, have, by constitutional provisions, provided against them. The courts of Michigan and Wisconsin and the executive of California have protected the people of those States from legislation of this kind, and saved them from its evil effects. Our State, by the decision of this court, is made to take a stride backward ; that work, which by our predecessors was so well done for the protection of the people from unjust, unconstitutional and ruinous taxation for private purposes, is destroyed, and the barriers against the aggressions of unconstitutional exactions are broken down.
 

 Upon the most mature consideration and thorough conviction, I dissent from the reasoning and conclusions of the majority as announced in their opinion.