## THE COUNTY OF WAPELLO v. THE B. & M. R. R. Co.

I.—Per DAY, J., SEEVERS and ROTHROCK, JJ., CONCURRING.

1. **Contract**: ENTIRETY: SUBSCRIPTION TO RAILWAY STOCK. A county, in accordance with the vote of a duly authorized election, subscribed for $100,000 of.the stock of a railway company, payment of which was to be made in bonds of the county; the articles of incorporation of the company provided that if the installments of subscriptions were not paid when called for the amount due should be collected by suit, or the stock with all payments made forfeited, or the stock sold at auction; the by-laws provided that certificates of stock should be issued, if desired, upon payment of.the first installment, and that the amount of the installment should be credited thereon; it was the practice of the company to give, in addition to these, receipts for subsequent payments, and paid-up certificates only when all the payments had been made; the county having issued its bonds for $30,000, and refused to issue more, and brought its action to compel the company to issue stock certificates for that amount, it was *held*,

  1. That the contract was an entire and indivisible one.

  2. That the articles of incorporation and by-laws contemplated the issue of paid-up certificates of stock only when all the installments had been paid.

  3. That the burden of establishing any contract respecting the conditions of subscription, other than that implied in the articles and by-laws, rested upon the party seeking advantage thereby.

  4. That such a contract would not be inferred from a mere understanding of the agent of the county that it had been entered into, nor from an admission of an officer of the company, nor from a recital in the bonds received from the county, which, if made effective, would nullify the conditions of the subscription.

2. ———: EFFECT OF ADJUDICATION. The county was released from its obligation to complete the performance of its contract by an adjudica-

tion that counties were not authorized to become subscribers to the capital stock of railway companies; but it did not thereby become entitled to insist that the company should issue to it certificates of stock for the amount already subscribed, in contravention of the terms of the subscription.

3. ———: STATUTE OF LIMITATIONS. The right of action in the county to recover the bonds or their value accrued at the time of the adjudication, and the statute of limitations would operate to bar the action at the end of five years thereafter.

### II.—Per Beck, J., Adams, J., concurring.

4. ———: ESTOPPEL: IT MUST BE MUTUAL. The railway company, by the receipt of the bonds, became a debtor of the county to the extent of their amount, and cannot insist that the failure to issue the whole amount covered by the subscription renders the contract void.

   *Argument.* Estoppels must be mutual, and while the county, by the decision of the federal court, is estopped to deny the validity of the bonds already issued, the company is estopped by the adjudication in the state court to demand the issue of bonds to complete the subscription.

5. ———: RECOVERY OF CONSIDERATION. The county is not deprived of the right to recover the consideration which it has paid under a contract void for want of authority to enter into it, by reason of its voluntary payment of the consideration.

6. ———: ———. The county was entitled to receive stock of the railway company for the bonds which it had issued under the contract.

7. ———: CONSIDERATION. The construction of the railway, in accordance with the conditions of the subscription, would not constitute sufficient consideration for the bonds and release the company from its obligation to issue the stock.

8. ———: FAILURE TO PERFORM. Nor would it be released by the fact that the company suffered loss by the failure of the county to issue all the bonds called for by the subscription.

9. ———: STATUTE OF LIMITATIONS. The statute of limitations would not commence to run until the company refused, after demand by the county, to issue to it paid-up certificates of stock to the amount of the bonds which it issued to the company.

### *Appeal from Wapello District Court.*

### Tuesday, October 24.

On the 12th day of January, 1870, the plaintiff filed in the Wapello District Court a petition in substance alleging that,

pursuant to an election for that purpose held, the county judge of Wapello county subscribed for one thousand shares to the capital stock of the defendant, of one hundred dollars each, payable in installments of five per cent per month, to be paid by the issuance of the bonds of said county, taken at par, and having twenty years to run, and that said county was to receive for each bond as it was issued a certificate for the same amount of stock in said company; that, about the 12th day of January, 1855, the county judge, supposing said subscription to be legal, issued to said company thirty thousand dollars of bonds upon said subscription, and delivered them to Oliver Cock, the secretary of the company, who received them for, and delivered them to the company, which used them in aiding to construct and complete the road.

That a part of the interest coupons attached to said bonds has been paid by said county, and the payment of other of said coupons has been demanded; that it has been determined by the Supreme Court of the United States that the payment of the principal and interest on the said bonds can be enforced, and that said county is legally bound to pay the same; that it has been settled by the Supreme Court of this State, in a *mandamus* proceeding upon the relation of the said B. & M. R. R. Co., that the said county of Wapello cannot issue any additional bonds in payment for the said one thousand shares subscribed to said capital stock.

That, on the 29th day of October, 1869, no certificates of stock having been issued to said county, it caused a demand to be made upon said company to issue certificates to the amount of thirty thousand dollars, and the company neglected and refused to issue the certificates.

That the county paid six installments of the stock subscribed for, and that it is the duty of the company, by the provisions of section eleven of the by-laws of said company, to issue certificates of stock upon the payment of the first installment; and that the county is now entitled to said certificate for thirty thousand dollars of stock paid by it; that the cash value of said thirty thousand dollars of certificates is thirty-five thousand dollars.

Plaintiff prays that defendant be ordered to issue said certificates of stock for thirty thousand dollars, and in default thereof that plaintiff have judgment against defendant for thirty-five thousand dollars, the value of the certificates, and for general relief.

On the 23d day of March, 1870, the defendant filed an answer, pleading the statute of limitations.

On the 26th of March, 1870, the defendant filed a further answer, in substance alleging that the railroad was put under contract in 1854, and was completed to Ottumwa in 1859; that six calls of five per cent each were paid by said county by the issue of thirty thousand dollars in the bonds of the county; that the balance of the subscription was legally called for, and that the county neglected to issue any bonds under said calls.

That in Oct., 1858, defendant demanded of said county the issue of said bonds in payment of said subscription, and that in March, 1859, the defendant brought a *mandamus* suit to compel the county to issue said bonds; that the county employed attorneys and made defense, and claimed that it had no power to issue the bonds; that the writ of *mandamus* was refused at the instance of the county, and the court refused to compel the delivery of said bonds; that long before June, 1862, and before any decision against the legality of such subscription, by any court in Iowa, plaintiff refused to deliver said bonds to defendant; and that the county has always resisted payment of said bonds and coupons by every means in its power, and has procured an injunction against the payment or collection of said bonds, and against the collection of any tax to pay them; and that the decision of the Supreme Court of Iowa, against the issuing of further bonds, was made at the instance and upon the motion of plaintiff.

The answer, amongst other things, denies that it was agreed upon the part of defendant that plaintiff should have for each bond issued, and as issued, a certificate for the same amount of stock; and denies that, under the by-laws of said railroad company, plaintiff is entitled to have issued certificates of full paid stock for said bonds.

On the 8th of August, 1871, the parties entered into a written agreement referring said cause to the Hon. E. S. Sampson, judge of the sixth district, and that the District Court of Wapello county should enter judgment upon the finding of the referee, the same as though the case had been submitted to the District Court of said county. The attorneys of the respective parties, with the understanding that either party might make additional proof, agreed upon the following facts:

"The plaintiff is one of the duly organized counties in this State, and has been since 1844. The defendant is a corporation duly organized under the laws of the State, and has been since 1852, and the object was to construct and run a railroad extending from Burlington to the Missouri river in this State.

"On the 24th day of August, 1853, the county judge of said county issued a proclamation calling an election. The election was duly held, and there were polled 1275 votes. Of these votes there were 1067 in favor of, and 208 against the subscription to the capital stock of said company.

"After the said election was held and the votes were returned and canvassed, the said county judge declared the result, and that the subscription had carried.

"After the said vote had been taken, returned, canvassed, and the result declared and recorded, the said county judge, for and in behalf of said county, acting under and in pursuance of said vote, subscribed for one thousand shares of said capital stock, of one hundred dollars each, payable in installments of five per cent per month, after said road should be put under contract to Ottumwa in said county. Said stock to be paid for by issuance of the bonds of the said county, having twenty years to run, and bearing an interest of eight per cent per annum, the amount to be expended in said county.

"On the 4th day of May, 1854, the said road having been put under contract to Ottumwa in said county, three installments of five per cent each on said capital stock were called for by said company, and due notice of said calls was given. On the 8th day of August, 1854, there were three other installments, of five per cent each, on said stock duly called for, of which due notice was given.

"After said calls for six installments had thus been made, the county judge of said county, on proper demand by said company, issued to said company thirty county bonds of one thousand dollars each, in the terms stipulated for in said proclamation and subscription, with interest. coupons to each of said bonds attached, and said bonds thus issued were duly delivered by said county judge to said company, which thirty bonds were issued under and by virtue of said subscription. These bonds were received by said company, and have been by said company transferred to innocent holders, and the company has appropriated the proceeds thereof to its own use, and in aid of the construction of said road in and through the said county of Wapello. These thirty county bonds were issued and delivered to said company on the 12th day of January, 1855.

"It is further admitted and agreed that no certificates of stock in the capital of said company have been issued by said company or its officers and delivered or tendered to said county; that on the 29th day of October, 1869, due demand was made on said company for the issuance of said certificates, and the delivery thereof to said county, as certificates of paid up stock in the capital of said company to the amount of thirty thousand dollars; that the said company absolutely and entirely refused to issue said certificates or any of them to said county, unless the said county would issue to said company seventy thousand dollars more of her bonds under said subscription.

"It is further agreed that at the time the said vote of said county was taken, to subscribe to said capital stock, there was, and there now is in force, a by-law of said company, in words as follows:

"'Sec. 11. Certificates of stock shall be issued to each subscriber, if desired, upon payment of the first installment, and the amount of such installment credited on the certificate. The certificates of stock shall be signed by the president and countersigned by the secretary.'

"It is further agreed that said company, after making due and legal calls on all the stockholders for all the installments

of stock of said company, to-wit: In October, 1858, demanded of said county of Wapello, and the judge thereof at his office in said county, to issue the said seventy thousand dollars of county bonds, and that said judge unconditionally refused to issue the same, and would not and did not issue the same nor any part thereof.

"It is further agreed that after the said demand and refusal by the county judge to issue said additional seventy thousand dollars of county bonds, to-wit: March 24, 1859, a *mandamus* proceeding to compel the said county to issue said bonds was commenced by said company, which said *mandamus* proceeding resulted as shown by reference to 13th Iowa Reports, 388. It is further agreed that from the decision of said *mandamus* suit as shown by 13th Iowa, there has been no appeal or writ of error, but the said cause remains as there determined.

"It is further agreed that the court in the adjudication of this cause may take judicial notice of all decisions made by the courts of the United States, and this State, on the county railroad bond question, so called.

"It is further agreed that defendant put its road under contract through said county in the year 1854, by way of Ottumwa, and prosecuted the same to completion with reasonable speed, and expended in building the same to Ottumwa more than one hundred thousand dollars; that calls were made by defendant upon plaintiff in the years 1855 and 1856, and due notice given thereof to plaintiff, for each of the remaining fourteen five per cent installments of unpaid stock, in accordance with the terms of the subscription thereof, and of the articles of incorporation and by-laws of said railroad company.

"The county vote and subscription record are in evidence for what they may prove. The pleadings, papers and records in the *mandamus* case of *B. & M. R. R. R. Co. v. Wapello County*, are in evidence for what they may legally prove.

"It is agreed that the said county resisted the demands of the said railroad company in the said *mandamus* suit, and employed counsel to defend the same; that the plaintiff refused to pay the stock installments when called for by the defendant, except as to the said thirty thousand dollar bonds, issued

as hereinbefore recited; that the said county at all times, from and during the year 1858, up to the year 1868, refused, upon demand, to pay the interest coupons upon the thirty bonds issued to said railroad company; that suits were brought by the assignees and holders of these coupons, at various times during said years, against said county, upon past due coupons, which said county refused to pay, and said county employed attorneys and defended said suits, and claimed and alleged the said bonds and coupons to be illegal and not binding upon said county, for reasons set forth in the records and proceedings of which the court may take judicial notice, as above stipulated. The pleadings, records and papers of said suit are in evidence for what they may prove.

"It is understood and agreed that this stipulation of facts is not to be construed as a waiver, on the part of defendant, of the benefit of the statute of limitations, but the facts herein agreed to are nevertheless to be received under and subject to that plea, as well as all other defenses and pleadings in the case."

Article XV, of the original articles of incorporation of said railroad company, is as follows:

"The board of directors may order installments to be paid on the stock subscribed, at such times and places and in such sums as they may direct, not exceeding five per cent per month, and if such installments, when called for as the by-laws may direct, are not promptly paid, the amount may be collected by suit against the delinquent stockholder, or the stock of such delinquent may be forfeited, by order of the board, to the company together with all payments made upon the same, the delinquent having been served with written notice to that effect ten days before his stock shall be declared forfeited, or the stock of such delinquent stockholder may, by order of the board of directors, be sold at auction, by giving such notice of the sale as the by-laws may prescribe, and if said stock does not sell for a sufficient sum to pay the full amount of unpaid assessments the board of directors may sue and collect the balance."

Article XVII, of the amendment to the articles of incorporation, adopted November 25, 1853, is as follows:

"The directors may receive subscriptions to the stock of the company from any counties within this State, or from any other municipal incorporations, upon such terms and conditions as may be agreed upon by them. Such counties, or municipal incorporations, being entitled to all the rights and privileges of individual stockholders. The board of directors may also authorize subscriptions to be made to the stock of said company, payable in real estate or other property, upon such terms and conditions as they may direct."

The proclamation submitting to vote the question of subscribing to the capital stock of defendant bears date August 24th, 1853, and is as follows:

"You are hereby notified that a special election will be held on Saturday, September 24th, A. D. 1853, at the usual place of holding elections, upon the following propositions, to-wit: 1st. The county to subscribe one hundred thousand dollars to the stock of the Burlington & Missouri River Railroad Company, to aid in constructing a road from Burlington to the Missouri river, *via* Ottumwa. Said stock to be paid for by the issue of the bonds of the county, redeemable in twenty years, bearing an interest not exceeding eight per cent per annum, and payable annually, to be issued upon the call of the company after the work in said county shall have been put under contract, in installments not exceeding five per cent per month, and to be taken at par. 2d. An annual tax to be levied for the payment of the interest until the dividends shall be given. 3d. The principal sum to be paid by a direct tax, unless previously satisfied by a sale of the stock, or by dividends."

The record of the county judge, made at the time of delivering the thirty bonds in question, is as follows:

"And now, on this 12th day of January, 1855, comes Oliver Cock, Secretary of Burlington & M. R. R. Co., and calls for the stock of said county, and there being six installments due, amounting to thirty thousand dollars, it is therefore ordered that the bonds for said stock be issued."

The court dismissed plaintiff's petition.    Plaintiff appeals. The further material facts appear in the opinion.

*H. B. Hendershott, E. L. Burton* and *E. H. Stiles,* for the appellant.

*D. Rorer* and *H. Strong,* for the appellee.

DAY, J.—I.    A very considerable portion of the argument upon both sides is devoted to the question whether the contract of subscription is entire, or divisible.    The defendant insists that the subscription was for one thousand shares, payable in installments as provided in the articles of incorporation, and that plaintiff is not entitled to certificates of stock, until all the installments are paid; whilst plaintiff claims that the contract was that a certificate of stock was to be issued for each bond as delivered.

1. CONTRACT: entirety: subscription to railway stock.

Section 15 of the articles of incorporation prescribes the general rule applicable to subscribers to the stock of the company.    This provides that if the installments, not exceeding five per cent per month, are not promptly paid when called for, the amount due may be collected by suit, or the stock with all payments made thereon may be forfeited, or the stock may be sold at auction, and if it does not sell for enough to satisfy the unpaid assessment, the balance may be collected of the delinquent.

And section 11 of the by-laws provides that certificates of stock shall be issued to each subscriber, if desired, upon the payment of the first installment, and the amount of such installment credited on the certificate.

Upon the part of defendant it was proved that the rule and invariable practice of defendant have been to give a part paid certificate upon payment of the first installment, receipts upon subsequent payments, and a full paid certificate in lieu of the part paid certificate and receipts, when full payment was completed, and that the authority for issuing part paid certificates is found in section 11 of the by-laws.

It is plain that article 15 of the articles of incorporation, and section 11 of the by-laws, taken together, contemplate

the issuing of full paid certificates of stock only upon payment of all the installments as assessed. In no other way could effect be given to the provision for the forfeiture of the stock and payments, in case of delinquency.

It is claimed, however, that under the amended article 17, above set out, the company was authorized to receive subscriptions from municipal corporations upon such terms as might be agreed upon. This section was not adopted until November 26, 1853, whereas the vote authorizing the subscription was taken on the 24th day of September preceding. However, as the record does not show when the subscription to the stock was in fact made, it may be conceded that this section was in force at that time. As this section does not prescribe the terms under which municipal corporations may subscribe, but simply provides that the board of directors may receive subscriptions from such corporations upon such terms as may be agreed upon, the presumption, in the absence of any proof to the contrary, is that subscriptions to the capital stock are made under the usual provisions of the articles of incorporation, and subject to the usual conditions. If any contract varying these provisions, or modifying these conditions, has been entered into in the present case, the burden of proof is upon the plaintiff to establish the existence of such exceptional contract and its terms.

We feel constrained to hold that the evidence does not show that the subscription in question was made under other conditions than those contained in article 15, above mentioned.

The evidence upon this subject is not voluminous, and it may be noticed.

First in point of time, and in importance, is the proclamation for the election. This seems to be very specific in calling the attention of the voters to all the material matters connected with the proposed vote. The electors are notified that the stock is to be paid in bonds, when they are to be issued, and at what rate per cent per month. The silence of this proclamation respecting a provision that the county was to have certificates of paid up stock for each bond, when issued,

raises a very strong presumption against the existence of a contract so exceptional in its character, and conferring upon the county privileges so superior to those granted to other subscribers to the capital stock.

Next follows what is satisfactorily proved to be a copy of the subscription paper to which the county subscribed. The heading is as follows: "The subscribers agree to take the number of shares set opposite their names, provided Ottumwa is made a point upon the said road." This is attached to the original articles of incorporation, which do not contain article 17, above referred to.

This subscription paper constitutes a written contract, referring to the articles of incorporation for all its terms, except that Ottumwa shall be a point upon the road, and it is not competent to vary or contradict the terms of this written contract by oral evidence. *Kennebec & Portland v. Waters*, 34 Maine, 369.

In addition to this, D. Rorer, one of the original incorporators of defendant, testifies that " the stock subscribed for by the county was to be paid as other stock, by installments as called for according to terms of subscription generally;" and Silas Osborne, the county judge of Wapello county, who made the subscription, testifies that he does not recollect that there was any difference between the subscription of the county and those of individuals.

The only evidence by which it is sought to establish the agreement contended for is the following:

*First.* Silas Osborne, the county judge, testifies that when he delivered the thirty bonds to Oliver Cock, in the presence of Rorer, "There was something said in regard to certificates of stock. They observed that they would forward the certificates as it was getting late, and they were in a hurry to get through, and they had not time, and they wanted to get back to Fairfield. * * * My understanding was that they were to issue certificates of stock as fast as the bonds were delivered." This witness further testified that when he paid installments upon his own stock he received certificates of stock, but the papers to which he referred were introduced,

and they proved to be mere receipts for the installments paid. It is evident that the distinction between a receipt and a certificate of stock is not clearly defined in the mind of the witness. Rorer, who was present at the time as the attorney of the company, and helped fill out the bonds, testified that they were asked for and issued in payment of the first six installments upon the county subscription, and that he believes Cock receipted for them as such to the county judge. This witness produces a copy of a receipt given to Henry county upon a like issue of bonds, and testifies that it was designed to act alike in regard to each county. The record kept by the county judge also shows that the bonds were issued in payment of installments due upon the subscription.

If, however, it should be conceded that Cock agreed to forward certificates when the bonds were delivered, this would have but little weight in proving the agreement contended for. Under section 11 of the by-laws the county, upon paying the first installment of stock, was entitled to a certificate with an indorsement thereon of the installment paid. Osborne does not testify that it was promised that paid up certificates of stock should be forwarded. The next item of evidence, upon which plaintiff relies, is the petition in the *mandamus* case, drafted in 1859 by Rorer, and sworn to by Reid, vice president of the company, and containing the following statement: "The said county to receive for each bond, as issued, a certificate for the same amount of stock in the company." This, as an admission upon the part of an officer of the company, must be admitted to be an item of evidence entitled to its proper weight in the consideration of the question involved. But it is a mere admission and cannot be regarded as at all conclusive. It cannot have the effect of overcoming the provisions of the written contract of subscription. Besides, that action was brought to compel the delivery of the remaining bonds. The condition under which the county was entitled to certificates of stock was only collaterally involved, and that circumstance is not without weight in determining the proper consideration to be given to this admission.

The only remaining item of evidence to which we are referred is a copy of the bonds delivered by the county, containing the following provision: "And the said county of Wapello doth also hereby agree to transfer to the holder hereof, on the first day of February, in the year 1870, or on the first day of February in any year prior thereto (when the holder shall elect to receive the same), on the delivery of this obligation and the unpaid interest coupons to said county, ten shares of the capital stock of the Burlington & Missouri River Railroad Company, of one hundred dollars each, subscribed for and issued to said county in exchange for and in satisfaction of this obligation."

When it is remembered that at the time these bonds were delivered it might very reasonably have been expected that all the remaining bonds would soon be issued, and the county would thereby become entitled to and receive certificates of shares of stock, it is apparent that this recital in the bonds is entitled to no controlling consideration.

It is claimed by plaintiff in the argument in reply that the form of the bonds was prepared by the attorney of defendant; but of this there is no proof. We are satisfied that the subscription of the county does not differ in terms from that of other subscribers; that it was payable in installments of not exceeding five per cent per month, and was subject to forfeiture for the non-payment of the installments when properly called for; and that under the terms of the subscription the county is not entitled to paid up certificates of stock until all the installments are paid.

II. The county having subscribed for one thousand shares of the capital stock of defendant, payable in installments of 2. ——: effect of adjudication. not exceeding five per cent per month, subject to the right of the defendant to declare a forfeiture of both the stock and the payments made for a failure to pay an installment when due, and with a right to paid up certificates of stock only when all installments are paid, and having paid but six installments of five per cent each, it follows that plaintiff is not entitled to certificates of stock unless in some manner it is to be excused for its delinquency.

Plaintiff insists that, notwithstanding the failure of plaintiff to pay fourteen installments upon the stock subscribed, amounting to seventy thousand dollars, it is still entitled to paid up certificates of stock for the installments paid.

This brings us to a consideration of the circumstances attending the delinquency of the plaintiff. The subscription was made upon condition that Ottumwa be made a point upon defendant's road. The proclamation for the election specified that the bonds are "to be issued upon the call of the company, after the work in said county shall have been put under contract."

The agreed statement of facts shows that the road was put under contract through Wapello county, by way of Ottumwa, in the year 1854, and that it was prosecuted to completion with reasonable speed.

On the 4th of May, 1854, three installments of five per cent were called for, and due notice of the calls was given; and on the 8th of August, 1854, three other installments of five per cent were duly called for, of which notice was given.

On the 12th day of January, 1855, the bonds in question were issued in payment of these six installments.

Calls were made by defendant upon plaintiff in the years 1855 and 1856 for each of the remaining fourteen five per cent installments of unpaid stock, and due notice thereof was given in accordance with the terms of the subscription and of the articles of incorporation and the by-laws of said railroad company. After making due and legal calls on all the stockholders for all the installments of stock, the company, in October, 1858, demanded of said county and the judge thereof, at his office, the issuance of bonds in payment of the remaining installments, and the judge unconditionally refused to issue the same. At this time it was the holding of the Supreme Court of this State that counties were authorized to subscribe to the capital stock of railroads, and that bonds issued for that purpose were legal. See *Dubuque County v. Dubuque & Pacific Ry. Co.*, 4 G. Greene, 1; *Clapp v. Cedar County*, 5 Iowa, 15. On the 24th of March, 1859, the defendant commenced a *mandamus* proceeding against plaintiff to compel

600 SUPREME COURT OF IOWA,

it to issue said additional seventy thousand dollars of bonds. The county resisted the demands of the railroad company in the *mandamus* suit, and employed counsel to defend the same. In this case, determined in 1862, it was for the first time held that counties have no corporate power to become subscribers to the stock of railroads; that the election held by plaintiff was void, and that the company could not compel the county to issue bonds in payment of its subscription. See 13 Iowa, 388.

Afterward, the Supreme Court of the United States held that bonds issued to railroads by counties, in payment of their subscriptions to stock, are valid when indorsed to innocent holders, and may be enforced. *Gelpcke et al. v. The City of Dubuque*, 1 Wal., 175.

The thirty bonds in question were transferred by defendant to innocent holders, and they have recovered judgment against Wapello county, upon the attached coupons, in an amount, including costs, of about $12,000. The county has levied taxes for the payment of these judgments, and eventually will be obliged to pay the principal and interest of these bonds.

Appellant insists that, as the county could not issue the seventy bonds without disobeying the judgment of the court and doing an illegal act, it is discharged from its agreement to issue these bonds, citing 2 Parsons on Contracts, 5th ed., p. 673, as follows: "That the illegality of a contract is in general a perfect defense, must be too obvious to need illustration. It may, indeed, be regarded as an impossibility by act of law; and it is put upon the same footing as an impossibility by act of God; because it would be absurd for the law to punish a man for not doing, or, in other words, to require him to do, that which it forbids his doing. Therefore, if one agrees to do a thing which it is lawful for him to do, and it becomes unlawful by an act of the legislature, the act avoids the promise."

That this doctrine is correct, no one will deny. But it is one thing to hold that a party cannot be compelled to perform an illegal contract, or be rendered liable in damages for non-performance; and quite another to hold that he may compel

performance upon the part of the other contracting party, although he has not himself performed, upon the ground that he is excused because of the illegality of his agreement.

That the contract is illegal, was a perfect defense to the county when a demand was made for the remaining seventy thousand dollars of bonds; and so this court held in the *mandamus* case. But now that the county demands certificates for thirty thousand dollars of stock, the same as though the remaining seventy bonds had been issued, a different principle becomes involved.

The granting of the relief asked involves the substitution of an entirely different agreement for the contract made. The county subscribed to one thousand shares of the capital stock of defendant, amounting to one hundred thousand dollars. It agreed to pay this upon demand, in installments not exceeding five per cent monthly. It has paid six of these five per cent assessments, and has refused to pay more. It agreed that, upon failure to pay an installment when duly demanded, the company might forfeit the stock and the payments made; or might collect the delinquent installments by suit; or might sell the stock for the payment of the installment due, and if that was insufficient for the purpose might sue for and collect the balance. By its subscription it became liable for the debts of the corporation to the extent of seventy thousand dollars, the amount of unpaid installments upon its stock. Rev., Sec. 1172.

The county now asks that it be relieved from this liability to creditors; that the company be deprived of its right to forfeit or sell its stock, or to sue for and collect the unpaid installments; that the six payments of five per cent installments upon one thousand shares, be treated as full payment upon three hundred shares, and that plaintiff have certificates of paid-up stock for this amount.

If the county had acted in entire good faith, and had sought to perform its contract, and had been prevented by the interposition of the law, declaring its contract illegal, it is difficult to see upon what principle the county, being unable to perform an agreement which it did make, can insist upon the sub-

stitution of another, and the enforcement against the defendant of an agreement which it did not make.

But the county, instead of showing a desire to perform its agreement, seems to have determined to repudiate it as soon as it became apparent that the road would be built through Ottumwa, and the benefits of the contract, in any event, secured.   In 1855 and 1856 it failed to pay the installments due; and in 1858 it made an unqualified refusal to pay them. At this time, under the law, as construed, there was no legal impediment in the way of issuing the remaining bonds.   In 1859 the *mandamus* suit was commenced.   The county actively defended this, and was instrumental in procuring the first adjudication of the Supreme Court declaring the illegality of the contract which it had made.

Whilst the county is clearly, under this decision, discharged from the further performance of its contract, there would seem to be no well grounded principle of equity upon which it can insist that, notwithstanding its own failure to perform, a new contract shall be substituted for the one made by defendant, and the defendant shall be compelled to perform that.

Appellant urges that it would be a strange idea if the county could be a stockholder, so far as to be compelled to pay its stock, should its board of supervisors refuse to do so, by *mandamus*, and yet not be a stockholder so far as receiving certificates of stock is concerned.   But, it seems to us, it would be equally strange if the county could be a stockholder, with all the benefits and privileges which that relation confers, and at the same time be discharged from all the duties which a stockholder assumes to the company and to its creditors.

The contract was either wholly legal or wholly illegal. There is no middle position for it to occupy.   If it was legal, the plaintiff cannot have the relief asked, because it has failed to pay the installments due, without which payment it is not entitled to certificates of stock.   If the contract was illegal, it cannot be made the basis of relief.   One horn or the other of the dilemma the plaintiff must take.

III.   The right of plaintiff to a money judgment, on account

of damages sustained by the delivery of the bonds in question,

3. ——: stat-
ute of limita-
tions.
was discussed in a supplemental argument, pursuant to request of this court. We deem it unnecessary to consider that question upon its merits, because we feel satisfied that any claim for relief based upon such ground is clearly barred by the statute of limitations.

The *mandamus* suit, holding that the subscription of plaintiff to the capital stock of defendant was unauthorized and void, was determined in June, 1862. Certainly as early as that date, if ever, a right of action accrued to plaintiff to have the outstanding bonds delivered up for cancellation, and, if by the act of defendant they had passed beyond its control, to recover the damages which plaintiff would. incur on account of the bonds having passed into the hands of innocent holders, and the liability of the county thereon having thereby become absolute.

This right of action would be barred in five years. As before stated, demand for the certificate was made in 1869, and this action was commenced in 1870.

The judgment of the court below, dismissing plaintiff's petition, is

AFFIRMED.

BECK and ADAMS, JJ., *dissenting.*

BECK, J., *dissenting.*—I am unable to assent to the foregoing opinion, and will proceed, as briefly as I can, to express my views upon the controlling points of law involved in the case. ADAMS, J., does not concur in the decision, and, I am authorized to say, approves. the views I entertain and the arguments upon which I rely to support the positions I have taken in the case.

I. Plaintiff insists that, under the contract between the parties, it was to receive for each of its bonds issued a certificate for the same amount of stock in the railroad company; that the contract, by its very terms, was divisible, and it is, therefore, entitled to stock of the defendant to the amount of bonds issued to it. It is claimed the evidence establishes that the contract under which the bonds were issued and delivered so

provides. We are of the opinion the evidence fails to support this position, certainly so far as that the plaintiff paid its subscription upon a contract different from that entered into by other subscribers to the stock of defendant, and having terms other than those prescribed by the charter and by-laws of defendant. Whether, under the charter and by-laws of defendant, the plaintiff is entitled to stock to the amount of payments made is, however, as it will be seen, in the view we take of the case, quite unnecessary to determine.

II. It was adjudged in an action between these same parties that plaintiff had no power to subscribe for the stock of defendant, and, in payment therefor, issue its bonds, and that its contract and act, in that respect, was *ultra vires* and void. *The State ex rel., etc., v. The County of Wapello*, 13 Iowa, 388. Without considering the doctrines of that decision, it is sufficient to remark that the power of the county to make the contract and the right of defendant to enforce it, are *res adjudicata*, which, as between the parties to this action, cannot again be presented to the courts for adjudication. The decision operated upon the contract of subscription, so far as the same had not been performed, and declared that it could not be enforced so as to require plaintiff to issue the bonds to pay the balance claimed to be due on the subscription. The judgment was that plaintiff could not be compelled to issue the bonds to the amount of $70,000, which was the relief asked by defendant. The grounds and reasons of this judgment are the invalidity of the subscription and the want of power in the county to become a stockholder in a railroad corporation. While the doctrines of the decision, applied to the bonds already issued, would declare them void, yet that was not a matter adjudged in the cause. The parties are bound no farther than as to the matters actually covered and included in the judgment. So far, our conclusions are based upon principles that are elementary and cannot be questioned.

III. But the United States Courts have held the bonds issued in payment of defendant's stock, to the amount of 4.——: estoppel: it must be mutual. $30,000, to be valid, and to constitute a legal obligation resting upon the county, and as such have

enforced them by judgments. While, as to these bonds, there has been a conflict in the principles announced by the State and Federal Courts, in the cases arising thereon and other like cases, there has been no conflict as to the judgments of the different forums upon the question of the obligation and power of the county to issue the bonds for the $70,000 of stock not paid. The record does not show that the United States Courts have adjudged, in a proper case involving that identical subject matter, that the county has authority to issue these bonds. The State court has adjudged that the county has no such power. The court was of competent jurisdiction and its judgment has not been reversed nor invalidated. Upon the subject matter of this judgment there has been no other adjudication to change the rights and relations of the parties as to the contract of subscription, so far as it remains unperformed. Neither does the record show that there has been any adjudication by the State court, upon those $30,000 of bonds issued to defendant, in conflict with the judgment of the Federal Courts thereon, involving the subject matter of those judgments, namely, these same bonds. The case presented, then, is this: The State court, possessing competent jurisdiction, has, in a judgment between these same parties, adjudged that the contract for stock, the subscription of plaintiff, being *ultra vires*, cannot be enforced, and cannot be lawfully performed so far as it remains unexecuted. The Federal Courts, clothed also with jurisdiction, have decided, in cases brought to enforce the payment of interest due on these bonds, that they are valid instruments and binding upon plaintiff.

The plaintiff is estopped to deny the validity of the subscription and of the bonds issued thereon, so far as the judgments rendered against it have declared them valid. Because the right of recovery was based upon the fact that the plaintiffs in those judgments were good faith purchasers, etc., does not give the county the right, under any circumstances, to deny the validity of the bonds upon which the judgments were based. The plaintiff is forever estopped to deny the validity of the causes of action upon which the judgments were rendered. This cannot be doubted. The estoppels

must be reciprocal and operate upon the plaintiff in the judgments. It would be inconsistent, too, with legal principles, to hold one party to a judgment estopped thereby and not the other. See Bigelow on Estoppel, pp. 47, 467, and authorities cited.

While defendant, in this case, may not stand in the relation of a *privy* to the plaintiffs in the judgments recovered against the county, so that it would be estopped thereby, yet it comes within the operation of an exception to the rule that judgments bind only parties and privies. Judgments are conclusive against third persons as to the relationship of debtor and creditor and the extent of that relationship, and must, also, be so regarded as to the foundation thereof—the origin of the relationship so far as it was in issue. Bigelow on Estoppel, pp. 81, 104, and authorities cited.

Now the validity of the bonds was in issue in the actions wherein judgments were rendered. It may be said that the validity of the subscription was not involved in these actions. This may be conceded. But the railroad company, after having entered into the contract with plaintiff embraced in the subscription, and received the bonds thereon which it transferred, and upon which judgments were rendered, whereby, as we have seen, defendant is estopped to deny the relation of debtor on the part of plaintiff, and the foundation of the indebtedness settled by the adjudication, cannot now insist that the contract so far as these bonds are concerned is void. To permit defendant to make such a defense would be simply to authorize it to take $30,000, or more, from plaintiff without the payment of one cent as a consideration. No principles of law can be so wrested as to bring about such a result.

The case then presents this state of facts: The defendant is estopped to deny the validity of the bonds upon which the judgments were rendered. These bonds were issued upon a contract entitling plaintiff to stock in the railroad company. The validity of that contract defendant cannot deny because it is a party thereto, and has received the bonds thereon. Under the contract the county is entitled to one dollar in stock for each dollar of its bonds issued to the defendant. If defend-

ant were in a situation to restore the bonds to plaintiff, it might do so and then plead the invalidity of the contract. But no principle of law or equity will permit it to keep the stock and bonds both, while the county, by its act, has been rendered liable for the full amount of the bonds.

IV. Under the decision of the State court the contract based upon plaintiff's subscription, as to the bonds not issued, must be regarded as void and neither party can support any claim thereon. It does not have the force and effect of a contract; it is without any validity, in respect to the $70,000 in bonds unpaid upon the stock. As to that subject matter it is not a contract. It is quite clear, therefore, that defendant cannot claim plaintiff is bound to issue and deliver these bonds; in law there is no such a contract, and defendant has no rights derived therefrom. Neither can defendant or plaintiff deny that the bonds issued are valid. Defendant by receiving and transferring them is estopped to deny their validity, and both parties are bound by the adjudications of the Federal Courts enforcing them.

The question now arises involving the rights of plaintiff and liability of defendant on account of the bonds received by the latter. The law will not permit one to receive, retain and appropriate to his own use, money or property of another without accounting therefor.

5. ——: recovery back of consideration.

In some cases when money is paid under a mistake of law it cannot be recovered back. But this principle is not applicable to the case before us. The mistake of the parties, if there was one, related to the existence of a legal contract, the parties believing a valid contract existed. It was then a mistake of fact. An illustration will possibly make this position plainer. A pays to B a sum of money in satisfaction of a promissory note supposed to be given to and held by the latter against the former. It is afterwards discovered that the note was not executed by A but by another person, or that it is a forgery, or that no such paper actually existed. Here is a mistake as to the existence of the contract. It cannot be doubted that the money could be recovered from the party receiving it. The case before us is not unlike the one put in

the illustration. The bonds were delivered to defendant on the supposition that a contract existed between the parties. It has been judicially determined that, as to the balance of plaintiff's unpaid subscription, the contract is *ultra vires* and, therefore, void, that there was no contract at all between the parties. The mistake, then, related to the very existence of the contract. Had plaintiff possessed the power to make the contract, but on account of defective execution or other informality, lapse of time, or other matters, it could not be enforced, the case would be different. Or had plaintiff received benefits which were alone the consideration for issuing the bonds it would have no claim on defendant. *Kraft v. City of Keokuk*, 14 Iowa, 86.

It has been held that where a municipal corporation receives money on a contract, which is void on account of want of authority so to bind itself, the sum so paid may be recovered back by the other party. *Dill v. Warham*, 7 Met., 438. See, also, *Argente v. San Francisco*, 16 Cal., 255. Undoubtedly the corporation would have the right, under the same principles, to recover money paid by it on its own contract, void for a like reason. We conclude that plaintiff is not deprived of the right to relief on the ground of the voluntary delivery of the bonds upon the void contract.

The defendant, having received and appropriated the bonds, which were valuable and useful in its enterprise, and are now valid and binding upon plaintiff, ought, *ex equo et bono*, to account to plaintiff therefor. This position is supported by the plainest principles of equity.

V. It is now necessary to determine what is the nature of the relief to which plaintiff is entitled against defendant; 6. —: ——. whether it may recover the value of the bonds at the time they were delivered to defendant, with interest, or whether it is a stockholder of defendant and entitled to certificates as such. The defendant cannot deny that the transactions resulting in its acquisition of the bonds, so far as they are alone concerned, are legal; nor can it deny that plaintiff's contract to issue the others is void, for it is bound by the adjudication to that effect.

The bonds were issued by plaintiff and received by defend-ant in payment for stock of the railroad corporation. This stock was the specific consideration to be rendered by defend-ant. The law will not imply a promise of defendant to pay plaintiff money for the bonds, but will carry out the very object of the transaction, namely, the acquisition by plaintiff of stock in the corporation. The bonds having been issued and delivered to defendant to purchase stock, and the transac-tions leading thereto having been held valid by an adjudication binding upon both of the parties, plaintiff is entitled to the stock. An illustration may serve to strengthen this position. A enters into a contract, entire in its provisions, to purchase of B one hundred bushels of wheat at two dollars per bushel, and pays $100 thereon. In an action between the parties it is adjudged that the contract, so far as it has been performed, is valid, but that it cannot be enforced so as to compel A to pay the balance of the money provided for therein. In that case A could not recover the money paid on the contract. By the payment he became entitled to fifty bushels of wheat, and he would recover accordingly. The case under consider-ation involves the same principles as the one here supposed.

VI. It is insisted that plaintiff is entitled to no relief on account of bad faith in refusing to perform the contract before the courts had decided adversely to its power to issue the bonds, and in resisting, by legal proceedings, the efforts of defendant to procure a performance of the contract by plaintiff. We do not think plaintiff can be convicted of bad faith in refusing to do that which the law prohibits, and in relying upon and enforcing its legal rights. It is the duty of corporations, as it is of citizens, to obey the law. And certainly a political corporation of the character of plaintiff is not guilty of bad faith in refusing to exercise powers withheld by the law. An appeal to the courts to determine its powers ought not to be the occasion of rendering its contracts valid which, in such proceedings, are declared invalid.

Upon this point the opinion of the majority, in our judg-ment, presents a view that is impossible to be taken from a judicial standpoint. The decision declaring the county had

no authority to issue the bonds was made in this court. Now the majority of this court hold that the county acted in bad faith in presenting its case for determination. The opinion proceeds in this language: "Instead of showing a desire to perform its agreement, it seems to have determined to repudiate it as soon as it became apparent that the road would be built through Ottumwa and the benefit of the contract in any event secured." For myself I may say that I fail to find support in the record for this statement of fact here made. But that is not the point to be considered just now. This court held the contract void—made without authority, in conflict with the law and constitution. Yet a majority of this court now hold good faith required the county to perform this illegal contract. Its action, done under the sanction of the judgment of this court, is stigmatized with the word "*repudiate*," everywhere odious, and which is never applied to the refusal to perform a void contract, but to the denial of the binding force of a valid obligation.

The opinion of the majority further says that the county "was instrumental in procuring the first adjudication of the Supreme Court (this court) declaring the illegality of the contract which it had made." The county, in bad faith, *procured* a decision of this court whereby it was enabled to consummate its intention to repudiate its debt! This is the thought of the quotation, and it is no less severe upon this court than upon the county.

VII. It is next insisted that plaintiff has received the benefit of the road built by defendant which was the consideration agreed upon for all the bonds to be issued to defendant under the contract. But we do not so understand the facts. The consideration of the bonds under the contract was the stock of the defendant; the building of the road was an inducement to the subscription, but not a consideration therefor.

*7.——: consideration.*

VIII. It is next urged that "there is an entire want of mutuality in plaintiff's claim, as neither plaintiff nor the court can reinstate the parties to the contract as they stood when the contract was made." In answer to this objection it

is only to be said that, under the conflicting adjudications, the contract has been partly enforced and partly annulled. It cannot be set aside and the parties restored to their. original condition, and such a remedy is not sought. The "mutuality of plaintiff's claim," as we understand the expression, is found in the fact that defendant has received and realized upon the bonds issued by plaintiff in return for which stock is demanded.

IX. It is set up in the answer, that the failure and refusal of plaintiff to issue all the bonds was the source of loss and detriment to the defendant in delaying the completion of the road, and probably for other reasons. It may be, but the point we do not decide, that plaintiff would be liable for results of that character. But, be this as it may, while defendant's witnesses, or some of them, state that defendant did suffer as claimed, yet the extent and nature of its loss is not established. It cannot be considered in this case. Loss is often sustained by reason of the non-performance of contracts for which the party suffering thereby can recover no compensation.

8. ——: failure to perform.

X. It is insisted by defendant's counsel that the action is barred by the statute of limitations. Only a brief consideration of this point is necessary. The delivery to defendant of the $30,000 in bonds constituted plaintiff a stockholder in the railroad corporation. The certificate of stock is but evidence of that fact. The failure to issue these certificates did not defeat plaintiff of its rights as a stockholder or destroy its property in the stock. The object of this suit is not only to obtain the certificates, but also to determine plaintiff's right to the stock itself. The statute would not commence to run until the cause of action accrued. It is obvious that a mere failure to issue the certificates, without a denial of plaintiff's right thereto and its property in the stock, would not be a ground of action. The custody of both certificates and stock, so to speak, was lawfully in the defendant. An action to obtain the certificates and establish plaintiff's right to the stock, would be answered by showing that the certificates were never demanded and plaintiff's

9. ——: statute of limitations.

rights never denied. This action accrued, then, upon refusal to issue the certificates and a denial of plaintiff's property in the stock, which was within the time fixed by the statute of limitations.

But defendant's counsel insist that, when the bonds were delivered to defendant, the plaintiff demanded certificates. It is conclusively shown, however, that the demand was not for paid up certificates, which would be evidence that plaintiff is the holder of paid up stock, but those showing partial payments. The claim then made was not that plaintiff was the holder of $30,000 of stock, but had paid $30,000 on its subscription of $100,000. Plaintiff claims that there was a special contract, apart from the subscription, to the effect that its bonds delivered to defendant entitled it to paid up stock *pro tanto*. Under this contract it claims the defendant agreed, upon request of plaintiff's agent when the bonds were delivered, to issue certificates of stock. As we have before stated, we do not think the evidence establishes such a contract. That demand or request cannot be considered as fixing the time when plaintiff's right to this action accrued. Indeed, plaintiff's rights, as we recognize them, did not accrue until after the actions concerning the bonds and the subscription, the decisions in which, according to the views of this opinion, are the foundation of plaintiff's right of action as presented in this cause. After this right of action accrued, defendant did not deny plaintiff's right to the stock, nor refuse to issue the certificate, until a demand was made in 1869, as it appears from the evidence. We conclude that the action is not barred by the statute.

We reach the conclusion that the judgment of the District Court ought to be reversed, and dissent from the decision announced in the opinion of the majority of this court.